Arthur F. SAWTELLE, etc., et al., Plaintiffs, Appellants,

v.

George E. FARRELL, et al., Defendants, Appellees.

No. 95–1501.

United States Court of Appeals, First Circuit.

Heard Sept. 13, 1995.

Decided Dec. 5, 1995.

Stanley M. Brown, Manchester, NH, with whom Mark A. Abramson and Abramson, Reis, Brown & Dugan, were on brief, for appellants.

Joseph M. Kerrigan, Nashua, NH, with whom Timothy G. Kerrigan and Hamblett & Kerrigan, P.A., were on brief, for appellees George E. Farrell and Speiser, Krause, Madole & Lear.

Joel S. Perwin, Miami, FL, with whom Paul R. Kfoury and Kfoury & Elliott, P.A., Bedford, NH, were on brief, for appellees Michael S. Olin and Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A.

Before SELYA and STAHL, Circuit Judges, and GORTON,* District Judge.

GORTON, District Judge.

New Hampshire residents, Arthur and Judith Sawtelle (the "Sawtelles"), filed a legal malpractice action in the United States District Court for the District of New Hampshire to recover damages sustained as a result of the alleged negligence of two attorneys and their law firms with respect to litigation in the State of Florida. None of the defendant-attorneys resides in New Hampshire, nor is any one of them licensed to practice law there. The defendants moved to dismiss the complaint for lack of specific *in personam* jurisdiction and the district court allowed the motion. Plaintiffs filed the present appeal. We affirm.

## I. Standard of Review

When reviewing a district court's ruling on a motion to dismiss an action for failure to make a prima facie showing of personal jurisdiction over a defendant, the appellate court draws the facts from the pleadings and the parties' supplementary filings, including affidavits, taking facts affirmatively alleged by the plaintiff as true and viewing disputed facts in the light most favorable to plaintiff. *Ticketmaster–New York, Inc. v. Alioto*, 26 F.3d 201, 203 (1st

---

* Of the District of Massachusetts, sitting by designation.

Cir.1994); *Kowalski v. Doherty, Wallace, Pillsbury & Murphy,* 787 F.2d 7, 9 (1st Cir.1986).[1] In so doing, however, "we do not credit conclusory allegations or draw far-fetched inferences." *Ticketmaster,* 26 F.3d at 203. Because the district court makes a legal determination when applying the prima facie standard, review by this Court is *de novo* (nondeferential). *Boit v. Gar–Tec Products, Inc.,* 967 F.2d 671, 675 (1st Cir. 1992).

## II. Background

On May 21, 1989, the plaintiffs' son, Corey, was killed when the aircraft he was flying, as a pilot under instruction, was struck over the New Hampshire–Vermont border by an aircraft from Florida. Several months later, the Sawtelles contacted an attorney in New Hampshire to discuss the filing of a wrongful death suit on behalf of their son's estate. The local attorney referred plaintiffs to the California-based law firm of Speiser, Krause, Madole & Cook, presumably because of the firm's reputation for expertise in aircraft litigation.[2]

In March 1990, an attorney at the California firm, which is not a party to this litigation, sent duplicate originals of a retainer agreement, which had already been executed on behalf of the firm, to the Sawtelles in New Hampshire. The retainer agreement included a provision granting the firm a lien upon any sum received in the plaintiffs' cause of action. The Sawtelles signed the agreement and returned an executed original to the California firm, which then transferred the case to its Washington, D.C. (now Rosslyn, Virginia) affiliate, the defendant Speiser, Krause, Madole & Lear ("the Speiser firm").

The case was assigned to defendant, George E. Farrell ("Farrell"), a Virginia resident and an attorney with the Speiser firm. Mr. Farrell is not licensed to practice law in New Hampshire. Although Farrell never personally met the plaintiffs, he sent at least fifteen letters to them in New Hampshire and spoke to them by telephone on numerous occasions during the representation. Among the topics addressed in those communications was Farrell's recommendation that Florida was the most advantageous forum for the wrongful death claim.

To assist as local counsel in Florida, Farrell engaged the Florida law firm, defendant, Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A. ("the Podhurst firm"). Defendant Michael S. Olin ("Olin"), a Florida resident and a member of the Podhurst firm, handled the Sawtelles' claims. He is licensed to practice law in Florida, but not in New Hampshire. Like Farrell, Olin never personally met the Sawtelles but did send numerous letters to them in New Hampshire and participated in several telephone conversations with them concerning his legal representation.

In March 1991, Attorney Olin filed a wrongful death action on behalf of the Sawtelles in the Broward County Judicial Circuit Court in Florida. The complaint for the estate was signed on behalf of the Speiser firm and the Podhurst firm. In July 1991, negotiations with the defendants in the underlying wrongful death claim resulted in a settlement offer of $155,000. By letter dated August 7, 1991, and in response to plaintiffs' concerns regarding the sufficiency of the settlement, Attorney Farrell told the Sawtelles that "[he] believe[ed] it [was] in [their] best interest to accept the settlement." Plaintiffs

---

1. Where the district court considers such a motion without holding an evidentiary hearing, that court applies the prima facie standard. *United Elec. Workers v. 163 Pleasant Street Corp.,* 987 F.2d 39, 43 (1st Cir.1993) (*"Pleasant St. II "*).

2. In an affidavit dated January 20, 1995, Mr. Sawtelle stated that plaintiffs obtained the name of the California firm when they saw an advertisement for that firm in a magazine published by the Aircraft Owners and Pilots Association ("AOPA"). The affidavit is identical to an unsigned and undated draft affidavit of Mr. Sawtelle except that the draft states that plaintiffs

were referred to the California firm by the New Hampshire attorney. In defendants' counter-affidavit they deny ever having advertised in any AOPA publication and, in support of their contention, they submitted an affidavit of an advertising assistant at AOPA who confirms that there were no advertisements for the law firm in the AOPA magazine for the years 1988 through 1991. The district court discounted the Sawtelles' claim that they retained the California law firm on the basis of a magazine advertisement. We do not disturb that determination.

allege that Olin, too, advised them, by telephone, that the settlement was in their best interest. The Sawtelles ultimately accepted the settlement offer.

Olin later became concerned about the disbursement of settlement funds to Corey Sawtelle's brother Jason, who was a minor at the time. To determine his obligations under New Hampshire law, Olin contacted an attorney in New Hampshire for advice regarding the distribution of the funds. Having obtained such advice, Attorney Olin finally disbursed the settlement funds in December 1991.

The Sawtelles subsequently learned that: 1) the estate of Ronald Brown, Corey's flight instructor who had also died in the crash, had filed a wrongful death suit in Florida; 2) the action had been consolidated with the case brought by Corey's estate; and 3) the instructor's claim had been settled for $500,-000. That discovery prompted the Sawtelles to file the present legal malpractice action against defendants in federal district court in New Hampshire.

The Sawtelles' malpractice claims allege that the defendants negligently negotiated an inadequate settlement of the wrongful death claim of their son's estate. Among the alleged shortcomings in defendants' performance were the failures: 1) to take depositions; 2) to obtain an economist's projection of their son's lost earning capacity; and 3) to consult liability experts or engage in significant investigative efforts. The Sawtelles further allege that defendants negligently directed settlement advice into New Hampshire (by telephone and mail), causing them to rely on that advice and thereby suffer economic loss in New Hampshire.

The defendants moved to dismiss for lack of personal jurisdiction. The motion was granted by the district court on April 28, 1995, and this appeal followed.

## III. Analysis

When a court's jurisdiction is contested, the plaintiff bears the burden of proving that jurisdiction lies in the forum state. *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Dalmau Rodríguez v. Hughes Aircraft Co.,* 781 F.2d 9, 10 (1st Cir.1986). In determining whether a non-resident defendant is subject to its jurisdiction, a federal court exercising diversity jurisdiction "is the functional equivalent of a state court sitting in the forum state." *Ticketmaster,* 26 F.3d at 204; *see also General Contracting & Trading Co. v. Interpole, Inc.,* 940 F.2d 20, 23 n. 4 (1st Cir.1991). The court must, therefore, find sufficient contacts between the defendant and the forum to satisfy both that state's long-arm statute and the Fourteenth Amendment's Due Process clause. *See Ticketmaster,* 26 F.3d at 204; *United Electrical Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1086 (1st Cir.1992) (*"Pleasant St. I "*); *Hahn v. Vermont Law School,* 698 F.2d 48, 51 (1st Cir.1983).[3] We explore these requirements *seriatim.*

### A. The New Hampshire Long–Arm Statute

It is well established in diversity cases that "the district court's personal jurisdiction over a nonresident defendant is governed by the forum's long-arm statute." *Goldman, Antonetti, Ferraiuoli, Axtmayer & Hertell v. Medfit Int'l, Inc.,* 982 F.2d 686, 690 (1st Cir.1993) (quoting *Pizarro v. Hoteles Concorde Int'l, C.A.,* 907 F.2d 1256, 1258 (1st Cir.1990)). In the case at bar, the group of defendants includes two individuals, a professional association and a partnership. Accordingly, we must consider the New Hampshire long-arm statutes applicable to each of these defendants.

The New Hampshire long-arm statute applicable to the individual defendants, Olin and Farrell, is N.H.Rev.Stat.Ann. ("RSA") 510:4, I (Supp.1994), which permits the exer-

---

3. In *Ticketmaster,* we observed that the extent of the required jurisdictional showing by a plaintiff depends upon whether the litigant is asserting jurisdiction over a defendant under a theory of "general" or "specific" jurisdiction. 26 F.3d at 204 n. 3; *see also Donatelli v. National Hockey*

*League,* 893 F.2d 459, 462–63 (1st Cir.1990) (detailing differences). In the case at hand, the Sawtelles' action turns on a theory of specific jurisdiction (i.e., jurisdiction which a state may assert when a claim arises directly out of forum-based activities.) *Id.* at 462.

cise of personal jurisdiction over a defendant who "transacts any business within [the] state" or "commits a tortious act within [the] state." In *Estabrook v. Wetmore*, 129 N.H. 520, 523, 529 A.2d 956 (1987), the Supreme Court of New Hampshire interpreted the latter phrase to include situations where a defendant's out-of-state activity results in an injury within New Hampshire. The Sawtelles exhaustively argue that their claims against the individual defendants satisfy each of the possible bases for personal jurisdiction. Not surprisingly, defendants disagree.

We need not dwell on this issue. The New Hampshire long-arm statute applicable to individuals has been interpreted to afford jurisdiction over foreign defendants "to the full extent that the statutory language and due process will allow." *Phelps v. Kingston*, 130 N.H. 166, 171, 536 A.2d 740 (1987). As recognized by the court below, when a state's long-arm statute is coextensive with the outer limits of due process, the court's attention properly turns to the issue of whether the exercise of personal jurisdiction comports with federal constitutional standards. *See Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 777 (5th Cir.1986), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1892, 95 L.Ed.2d 499 (1987).

We reach a similar conclusion with respect to the professional association defendant. New Hampshire's long-arm statute governing unregistered foreign corporations, such as the Podhurst professional association, is RSA 293–A:15.10 (Supp.1994). That statute includes no restriction upon the scope of jurisdiction available under state law and thus authorizes jurisdiction over such entities to the full extent permitted by the federal Constitution. *See McClary v. Erie Engine & Mfg. Co.*, 856 F.Supp. 52, 55 (D.N.H.1994) (because RSA 293–A:15.10 reaches to the federal limit, the traditional two-part analysis for personal jurisdiction "collapses into the single question of whether the constitutional requirements of due process have been met").

The appropriate treatment of the Speiser firm is less clear. The New Hampshire long-arm statutes do not, by their terms, apply to partnerships, and the case law does not discuss any long-arm provision applicable to such entities. To address that unresolved issue of state law, the Sawtelles turn for guidance to RSA 305–A:6–8 (Supp.1994), which relates to service of process on a foreign partnership. Observing that service on a foreign partnership is treated nearly identically to service on a foreign corporation under RSA 293–A:15.10, plaintiffs argue that partnerships are to be treated as corporations for determining personal jurisdiction. If that is so, then, as in the individual and corporate contexts discussed above, the scope of jurisdiction over the Speiser firm partnership is commensurate with that permitted under the Constitution.

We find it unnecessary to resolve this unsettled issue of state law because a plaintiff seeking to establish jurisdiction over a foreign defendant must satisfy the demands not only of state law but also of the federal Constitution. When confronted with a similar quandary in *Ticketmaster*, we chose to bypass the statutory phase of the jurisdictional inquiry because the plaintiff's case could not pass constitutional muster. 26 F.3d at 206. We therefore assume, *arguendo*, that under New Hampshire law the scope of personal jurisdiction over the Speiser firm partnership is, as in the case of the corporate defendant, coextensive with the outer limits of due process.

## B. The Due Process Clause

When embarking upon the fact-sensitive inquiry of whether a forum may assert personal jurisdiction over a defendant, the court's task is not a rote, mechanical exercise. Indeed, "[d]ivining personal jurisdiction is 'more an art than a science.'" *Ticketmaster*, 26 F.3d at 206 (quoting *Donatelli*, 893 F.2d at 468 n. 7). The Fourteenth Amendment's concern of fundamental fairness is achieved by the central requirement that certain "minimum contacts" exist between the defendant and the forum state. *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945); *Ticketmaster*, 26 F.3d at 206. This Circuit utilizes a three-part analy-

sis to determine if sufficient contacts exist to exercise specific personal jurisdiction:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Pleasant St. I,* 960 F.2d at 1089; *see also Pritzker v. Yari,* 42 F.3d 53, 60–61 (1st Cir. 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1959, 131 L.Ed.2d 851 (1995); *Ticketmaster,* 26 F.3d at 206. Central to each step of the established analysis, therefore, are the contacts which are attributable to each defendant in this case.[4]

**1. Relatedness.**

 Our first consideration under the tripartite framework is whether the plaintiffs' claim arises out of, or relates to, defendants' in-forum activities. *Ticketmaster,* 26 F.3d at 206. Although this requirement is "the least developed prong of the due process inquiry," it serves the important function of focusing the court's attention on the nexus between a plaintiff's claim and the defendant's contacts with the forum. *Id.; see also Pleasant St. I,* 960 F.2d at 1089. Relatively speaking, the relatedness test is a "flexible, relaxed standard," *Pritzker,* 42 F.3d at 61, as suggested by the disjunctive nature of the requirement. *See Ticketmaster,* 26 F.3d at 206.

 The relatedness requirement is not met merely because a plaintiff's cause of action arose out of the general relationship between the parties; rather, the action must directly arise out of the specific contacts between the defendant and the forum state. *See, e.g., Fournier v. Best Western Treasure Island Resort,* 962 F.2d 126, 127 (1st Cir.

1992) (where plaintiff had made vacation arrangements in Massachusetts but was injured out-of-state, cause of action did not "arise from" the defendant resort operator's contacts with Massachusetts within the meaning of the state long-arm statute); *Marino v. Hyatt Corp.,* 793 F.2d 427 (1st Cir. 1986) (same); *Pickens v. Hess,* 573 F.2d 380, 386 (6th Cir.1978) (no personal jurisdiction over defendants under state long-arm statute which extends to limits of due process when "the cause of action between the parties did not arise from any acts of the defendants in [the forum state]"); *Bryant v. Weintraub, Genshlea, Hardy, Erich & Brown,* 844 F.Supp. 640, 642 (D.Or.1994) (where Oregon resident sued California law firm for failure to obtain service in California, the injury arose directly from alleged malpractice in California and had no connection to the firm's other Oregon contacts), *aff'd,* 42 F.3d 1398 (9th Cir.1994). We therefore must consider the contacts between the defendants and the forum state viewed through the prism of plaintiffs' legal malpractice claim.

 Of the limited contacts between the defendants and New Hampshire during their legal representation, few are relevant to the Sawtelles' claim of legal malpractice and thus few assist them in satisfying the relatedness element of the jurisdictional inquiry. For the Virginia defendants, Attorney Farrell and the Speiser firm, the relevant contact was the August 7, 1991 letter mailed to the plaintiffs in New Hampshire, in which Farrell stated that he believed it to be in the Sawtelles' best interests to accept the $155,-000 settlement offer. For the Florida defendants, Attorney Olin and the Podhurst firm, the relevant contact with the forum, for purposes of the Sawtelles' malpractice claim, was Olin's telephone call to New Hampshire in which he concurred in the settlement recommendation.

 The transmission of information *into* New Hampshire by way of telephone or mail is unquestionably a contact for purposes of

---

4. Under elemental principles of agency, the contacts of Attorneys Olin and Farrell with New Hampshire are attributable to the Podhurst and Speiser firm, respectively. *See Pleasant St. I,* 960 F.2d at 1090 (contacts of corporation's agent can

subject the corporation to personal jurisdiction); *Donatelli,* 893 F.2d at 467 (contacts of a partner committed in furtherance of partnership business are imputed to the partnership).

our analysis. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 2184, 85 L.Ed.2d 528 (1985). It would, however, be illogical to conclude that those isolated recommendations constituted the negligent conduct that caused the Florida injury and thus were in-forum acts sufficient to establish specific personal jurisdiction in New Hampshire.[5] A review of all the allegedly negligent actions of the defendants preceding the injury indicates numerous non-forum decisions reached by the defendants in Virginia and Florida, but not in New Hampshire. It was the defendants' investigation, in Florida and Virginia, which informed their judgment about the amount and propriety of the proposed settlement. In short, it was the aggregate of the defendants' allegedly negligent acts and omissions which caused the Florida injury, and the out-of-forum negligence was the effective cause. *See Ticketmaster,* 26 F.3d at 207; *Pleasant St. I,* 960 F.2d at 1089 (noting how causation principles inform the due process analysis).

In its analysis of the relatedness requirement, the district court relied upon *Kowalski v. Doherty, Wallace, Pillsbury & Murphy,* 787 F.2d 7 (1st Cir.1986). In *Kowalski,* a New Hampshire resident filed suit in New Hampshire against a Massachusetts law firm alleging that the firm had negligently permitted the dismissal of a wrongful death suit pending in Massachusetts. *Id.* at 8. Although the firm was aware of its client's New Hampshire residency at the time it filed the wrongful death action, this Court affirmed the dismissal of the malpractice action for lack of personal jurisdiction under the New Hampshire long-arm statute. In so doing, we rejected the plaintiff's contention that, because the "effects" of the firm's negligence were felt in New Hampshire, the law firm had caused an injury there by conduct directed at that forum. *See id.* at 11. Instead, we observed that:

> [the client's] injury occurred when the suit was dismissed by the Massachusetts court. The consequence of the dismissal is that

plaintiffs are barred from bringing a wrongful death action in the Massachusetts courts. The injury, if any, occurred in Massachusetts.

*Id.; see also Cote v. Wadel,* 796 F.2d 981, 984 (7th Cir.1986) (where the negligence of a Michigan law firm resulted in a Wisconsin plaintiff losing "a valuable property in Michigan consisting of a cause of action against a doctor, ... [t]he handful of letters and phone calls" that passed between the client and firm was not enough for personal jurisdiction over the firm in Wisconsin).

The Sawtelles attempt to distinguish *Kowalski* and *Cote* by pointing out that, unlike the instant action, those cases involved legal malpractice claims based upon the failure of attorneys to comply with procedural rules, thereby causing the loss of rights of their respective clients. In such cases, the Sawtelles contend, the exercise of personal jurisdiction would have been improper because the malpractice actions did not arise out of the contacts between the attorneys and the forum states. In contrast, the plaintiffs argue that their malpractice claim satisfies the relatedness requirement because the defendants directed negligent settlement advice into New Hampshire, thereby causing plaintiffs harm in New Hampshire as a result of their reliance upon such advice.

We are not convinced that the plaintiffs have distinguished themselves from the plaintiff in *Kowalski.* It may be true that the defendants' alleged malpractice was not consummated until they communicated their misconceived advice to plaintiffs in New Hampshire by telephone and mail and the plaintiffs' relied on the advice to their detriment. Ultimately, however, the gravamen of the Sawtelles' claim is that they suffered in New Hampshire the "effects" of the defendants' negligence committed elsewhere. *See Kowalski,* 787 F.2d at 11. The communications sent into New Hampshire were ancillary to the allegedly negligent non-forum activities, and because those communications

---

5. The injury suffered by the Sawtelles as a result of the alleged negligent activities—the loss of their right to an adequate recovery on the wrongful death claim which had been filed in Florida— occurred in Florida when the state court approved the recommended settlement and terminated the pending lawsuit. *See Kowalski v. Doherty, Wallace, Pillsbury & Murphy,* 787 F.2d 7, 11 (1st Cir.1986).

were the only relevant contacts with the forum for purposes of the Sawtelles' malpractice claim, we conclude that the plaintiffs' showing of relatedness should be characterized as tenuous at best. It hangs, as it were, by a thread.

## 2. Purposeful Availment.

We next consider whether defendants' contacts with New Hampshire represent a purposeful availment by defendants of the privilege of conducting business in that State. The function of the purposeful availment requirement is to assure that personal jurisdiction is not premised solely upon a defendant's "random, isolated, or fortuitous" contacts with the forum state. *See Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984). Our focus is on whether a defendant has "engaged in any purposeful activity related to the forum that would make the exercise of jurisdiction fair, just, or reasonable." *Rush v. Savchuk,* 444 U.S. 320, 329, 100 S.Ct. 571, 577, 62 L.Ed.2d 516 (1980). In *Ticketmaster,* 26 F.3d at 207, this Court observed that the cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability.

### a. Voluntariness

The Sawtelles contend that the requisite voluntariness is present because "in the context of attorney-client relationships the act of knowingly agreeing to represent an out-of-state client is plainly sufficient." Plaintiffs' Brief at 36. Plaintiffs aim to bolster their argument by pointing to their law firms' alleged promotion of their reputations beyond their respective borders. We consider these arguments in turn.

At the time they agreed to provide legal advice and representation to the plaintiffs, the defendants knew the Sawtelles were residents of New Hampshire. Defendants' contacts with New Hampshire, however, were limited to communicating with the clients in their home state. The wrongful death litigation was prosecuted in Florida, while other legal services were being rendered in Florida and other places outside New Hampshire. A review of the totality of the defendants' contacts with the forum state leaves us gravely doubtful that the defendants purposefully availed themselves of the benefits and protections of New Hampshire law.

The Eighth Circuit case of *Austad Co. v. Pennie & Edmonds,* 823 F.2d 223 (8th Cir. 1987), is instructive on this requirement for personal jurisdiction. In *Austad,* a New York law firm represented a South Dakota client in patent litigation pending in Maryland. The contacts between the firm and South Dakota during the representation included numerous phone calls, mailings, and a three-day factfinding visit to South Dakota by a lawyer from the firm. *See id.* at 224–25. The client later sued the firm for malpractice in federal district court in South Dakota. The Court of Appeals held that the defendant law firm's contacts with the forum were insufficient to satisfy the "purposeful availment" requirement, stating:

> While we do not dispute [the client's] claim that an attorney-client relationship existed between [the parties], we do not believe that [the firm] had sufficient contacts with South Dakota to confer personal jurisdiction.

823 F.2d at 226. The *Austad* court thus deemed the firm's only "substantial connection" with the forum, its voluntary representation of a South Dakota corporation in litigation outside of South Dakota, as insufficient to support a finding of purposeful availment. *See id.* at 227.

In the case at bar, as in *Austad,* the contacts of the defendants with New Hampshire were limited, consisting primarily of written and telephone communications with the clients in the state where they happened to live. *Compare Sher v. Johnson,* 911 F.2d 1357, 1362–63 (9th Cir.1990) (contacts between client and non-resident law firm consisting of telephone calls, mailings, and three visits by lawyer to forum state to visit client were not, by themselves, sufficient connections with forum to establish purposeful availment) *with Trinity Industries, Inc. v. Myers & Associates, Ltd.,* 41 F.3d 229, 230–31 (5th Cir.1995) (jurisdiction over an Illinois law firm sued by a Texas client for malpractice was upheld because the firm had purposefully availed itself of privileges of doing

business in Texas by extended representation of the client in at least 40 matters, including a court appearance in the forum).

 The mere existence of an attorney-client relationship, unaccompanied by other sufficient contacts with the forum, does not confer personal jurisdiction over the nonresident in the forum state; more is required. *See Burger King,* 471 U.S. at 479–80, 105 S.Ct. at 2186; *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958); *Trinity Industries,* 41 F.3d at 230 & n. 6; *Cote,* 796 F.2d at 984 ("[p]ersonal jurisdiction over nonresidents ... is a quid for a quo that consists of the state's extending protection or other services to the nonresident"). In this case, the defendant-attorneys' only connection with New Hampshire was the Sawtelles' residence there. *See Trinity Industries,* 41 F.3d at 231 n. 8.

The case on which the plaintiffs rely as "most like" the instant action is *Waterval v. District Court,* 620 P.2d 5 (Colo.1980), *cert. denied,* 452 U.S. 960, 101 S.Ct. 3108, 69 L.Ed.2d 971 (1981), in which the Colorado courts exercised jurisdiction over a Virginia attorney who had rendered negligent financial services to a Colorado resident. In *Waterval,* the attorney-client relationship arose when both parties were residents of Virginia and the attorney established and oversaw for the client the administration of a discretionary investment account in a Virginia bank. *Id.* at 7. After the client moved to Colorado, the attorney-client relationship continued when the lawyer handled a real estate transaction in connection with the sale of his client's house in Virginia. He later dealt negligently, by telephone and correspondence, with the client in Colorado with respect to a recommended transfer and eventual liquidation of certain investment account assets. *Id.*

After determining that the defendant-attorney's contacts satisfied the Colorado long-arm statute, the *Waterval* court held that the exercise of jurisdiction comported with federal due process requirements. *Id.* at 7–8.

With respect to the issue of purposeful availment, the court described several contacts between the defendant and the forum state but, most significantly, that defendant voluntarily:

1) chose to continue an attorney-client relationship which had originated in Virginia even after the client had moved to Colorado,

2) engaged in contacts which were "personal in character and resulted in a tangible and monetary benefit to [himself]," and

3) acted in a way to impact directly upon the legal and financial interests of a Colorado resident.

*Id.* at 10. Because the cause of action stemmed, in part, from the adverse consequences of defendant's negligent legal and financial counseling directed to a Colorado resident over a two-year period, the court concluded that defendant could have reasonably anticipated being held accountable in Colorado for those activities. *Id.*

The instant action is distinguishable. Whereas Mr. Sawtelle initially contacted the Speiser firm which, in turn, retained the Podhurst firm, the defendant-attorney in *Waterval* initiated contact and actively solicited, and negligently handled, his client's investment business after the client had moved to Colorado. Furthermore, the relationship between the Sawtelles and the Speiser firm was not extended and was much less pervasive than the relationship in *Waterval.*

The Sawtelles next attempt to demonstrate the requisite voluntariness by claiming that the defendants' efforts to cultivate their images as "national" firms were deliberate, significant activities within the forum sufficient to satisfy the purposeful availment requirement. *See Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84; *Keeton,* 465 U.S. at 781, 104 S.Ct. at 1481–82. For example, the Sawtelles point to the Podhurst firm's listing in Martindale–Hubbell which proudly reports of "serv[ing] clients and corporations throughout the United States." [6] As a result of those efforts, plaintiffs contend, the defen-

---

**6.** Plaintiffs seek to fortify this argument by reference to the Speiser firm's alleged advertisement in an AOPA publication discussed in note 2, *supra.* For the reasons articulated therein, we choose to disregard the discounted allegation in our consideration of purposeful availment.

dants purposefully derived benefits from their interstate activities.

■ This Court has previously declined to adopt the "stream of commerce" theory of personal jurisdiction, a form of which is thus advanced by the Sawtelles. *See Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 681–82 (1st Cir.1992); *Dalmau Rodríguez v. Hughes Aircraft Co.*, 781 F.2d 9, 15 (1st Cir.1986). We are guided to this conclusion by the Supreme Court's rejection of the claim that a commercial enterprise should be subject to personal jurisdiction wherever its conduct foreseeably causes injury, regardless of whether the defendant directed its conduct toward the forum state. *See Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 112, 107 S.Ct. 1026, 1032, 94 L.Ed.2d 92 (1987) ("The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State").

The Podhurst firm's promotional activity falls substantially short of sufficing to subject that firm to personal jurisdiction in New Hampshire. First, the Florida firm became involved in the subject representation not as the result of affirmative efforts to promote business in New Hampshire, but only after being requested by the Virginia firm to commence litigation in Florida. More importantly, to treat the Podhurst firm's general statement in Martindale–Hubbell as a sufficiently direct "targeting" of New Hampshire would, in effect, embrace the "stream of commerce" theory of personal jurisdiction which this Court has already rejected. *See Boit*, 967 F.2d at 681–82; *Dalmau Rodríguez*, 781 F.2d at 15.

**b. Foreseeability**

■ Bearing in mind the second pillar of the purposeful availment requirement, we proceed to consider the Sawtelles' contention that it was foreseeable that the defendants would be haled into a New Hampshire court as a result of their legal representation of New Hampshire residents. The enforcement of personal jurisdiction over a non-resident defendant is foreseeable when that defendant has established a continuing obligation between itself and the forum state. *See Burger*

*King*, 471 U.S. at 476, 105 S.Ct. at 2184; *Travelers Health Ass'n v. Virginia*, 339 U.S. 643, 648, 70 S.Ct. 927, 930, 94 L.Ed. 1154 (1950). Among the continuing obligations between the defendants and the forum state relied upon by the Sawtelles are 1) the involvement of New Hampshire law in the distribution of the settlement proceeds, and 2) the contract by which the Speiser firm obtained a lien on any proceeds received in connection with the plaintiffs' cause of action.

We are underwhelmed by the force of the plaintiffs' argument. The requirements of New Hampshire law with respect to the distribution of settlement proceeds procured from the Florida litigation has no bearing upon the question of whether or not the defendants purposefully availed themselves of that law. More importantly, although the plaintiffs required the assistance of New Hampshire counsel in order to distribute settlement proceeds to their minor son, the defendant law firms themselves performed no legal services in New Hampshire in that regard.

In support of their contention that the lien granted to the Speiser firm by the retainer agreement constitutes purposeful availment of the privileges and benefits of New Hampshire law, the Sawtelles rely upon *Sher v. Johnson*, 911 F.2d 1357 (9th Cir.1990). *Sher* involved a legal malpractice action brought in California by a resident of that State who had hired a Florida law firm to represent him in a criminal matter in Florida. The Florida firm's contact with California included: 1) phone calls and letters sent to the client; 2) three California visits with the client by a member of the firm; and 3) execution of a deed of trust whereby the law firm obtained a lien on the client's home in California. *Id.* at 1360.

In reversing the district court's dismissal of the malpractice action for lack of personal jurisdiction, the Ninth Circuit Court of Appeals found that the deed of trust tipped the scale in favor of a finding of purposeful availment. *See id.* at 1363. Although neither the written and telephonic communications nor the California visits sufficed, by themselves, to establish purposeful availment, the addi-

tion of the execution of the deed of trust signified a sufficient invocation of the benefits and protections of the laws of California to warrant the exercise of jurisdiction. *See id.* at 1363–64. The Court reasoned that the security interest "contemplated [significant] future consequences" in the forum-state, i.e., perfecting an interest in real estate would require recording in California, while obtaining and enforcing a judgment on the deed would require both the application of the forum's law and court action in California. *Id.* at 1363.

The *Sher* decision is readily distinguishable from the case before us, however. While the deed of trust in *Sher* gave the Florida partnership a security interest in real property located in California, the lien granted to the Speiser firm did not encumber or affect title to any New Hampshire real estate. The Speiser lien was a transitory obligation which traveled wherever the Sawtelles or the holder of the proceeds might go. Even without a lien, a contractual obligation to pay the Speiser firm's fee existed, an obligation enforceable wherever the Sawtelles were located. Unlike the *Sher* deed of trust, therefore, the Speiser lien required no entanglement with the law of the forum state.

Consequently, the frailty of plaintiffs' showing at this second stage of the personal jurisdiction analysis is even more pronounced than the tenuous showing of relatedness, discussed *supra.* This "thread" is frayed and tattered. The mere act of agreeing to represent (and then representing) an out-of-state client, without more, does not suffice to demonstrate voluntary purposeful availment of the benefits and protections of the laws of the client's home state. Furthermore, the alleged continuing obligation between the defendants and New Hampshire is virtually non-existent. Ultimately, the weakness of plaintiffs' arguments with respect to the first two stages of the personal jurisdiction analysis provides insufficient support for their appeal, even when stitched together with their argument as to the final stage, to which we now turn.

### 3. The Gestalt Factors.

A court's jurisdictional inquiry is not merely a "mechanical exercise," *Ticket-*

*master*, 26 F.3d at 208, and concepts of reasonableness must illuminate the minimum contacts analysis. *See World–Wide Volkswagen Corp.*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980); *Pleasant St. I*, 960 F.2d at 1088 ("[E]ven where purposefully generated contacts exist, courts must consider ... other factors which bear upon the fairness of subjecting [nonresidents] to the authority of a foreign tribunal"). The Supreme Court has identified five such considerations, which this Court has termed the "gestalt factors": (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies. *See Burger King*, 471 U.S. at 477, 105 S.Ct. at 2184–85. Although this part of the jurisdictional analysis has parameters which are not well defined, we know it serves the purpose of assisting courts to achieve substantial justice. *See Pritzker*, 42 F.3d at 63–64; *Ticketmaster*, 26 F.3d at 209.

In *Ticketmaster*, this Court observed that the reasonableness stage of the jurisdictional analysis evokes a sliding scale:

> [T]he weaker the plaintiff's showings on the first two prongs (relatedness and purposeful availment), the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of relatedness and purposefulness.

26 F.3d at 210. Moreover, we note that a failure to demonstrate the necessary minimum contacts eliminates the need even to reach the issue of reasonableness: "[t]he [g]estalt factors come into play only if the first two segments of the test for specific jurisdiction have been fulfilled." *Pleasant St. I*, 960 F.2d at 1091 n. 11. We proceed to consider the gestalt factors, bearing in mind the flimsy showings of relatedness and purposeful availment made by the plaintiffs in this case.

### a. The Defendants' Burden of Appearance

■■■■■ The extent of the burden on the defendants to litigate the malpractice action in New Hampshire falls short of reaching constitutional significance. For Attorney Farrell and the Speiser firm, the burden of defending in New Hampshire would not be substantively different from the burden of litigating in Florida. Of course, the comparative burden on Attorney Olin and the Podhurst firm of litigating in New Hampshire rather than their home state would be greater. In *Pritzker*, however, this Court recognized that defending in a foreign jurisdiction almost always presents some measure of inconvenience, and hence this factor becomes meaningful only where a party can demonstrate a "special or unusual burden." 42 F.3d at 64. When, as here, a law firm regularly represents clients outside its home state, we conclude that the burden is neither special nor unusual.

### b. The Forum State's Adjudicatory Interest

■■■■■ This Court has recently observed that "[t]he purpose of [this] inquiry is not to *compare* the forum's interest to that of some other jurisdiction, but to determine the extent to which the forum *has* an interest." *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 151 (1st Cir.1995) (emphasis in original). Although it is true that a forum state has a demonstrable interest in obtaining jurisdiction over a defendant who causes tortious injury within its borders, see *Ticketmaster,* 26 F.3d at 211, New Hampshire has a far less compelling interest in the prosecution of a legal malpractice suit stemming from an injury that occurred outside of its borders. Here, the acts comprising the defendants' alleged negligence occurred almost entirely outside of New Hampshire. *See Donatelli,* 893 F.2d at 472 ("[A]part from a generalized concern for the rights of its own domiciliaries, the [forum] state has no real interest in adjudicating the controversy"). This factor thus cuts against jurisdiction.

### c. The Plaintiffs' Interest in Obtaining Convenient Relief

■■■ The third factor to consider is the plaintiffs' interest in obtaining convenient and effective relief. We need not dwell long here. This Court has repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience. *See, e.g., Foster–Miller, Inc.,* 46 F.3d at 151; *Pritzker,* 42 F.3d at 64; *Ticketmaster,* 26 F.3d at 211. Here, unquestionably, it would be more convenient for the Sawtelles to litigate their malpractice claim in their home state rather than elsewhere.

### d. The Administration of Justice

We next evaluate the judicial system's interest in obtaining the most effective resolution of the controversy. Although the Virginia defendants contend that this consideration would best be satisfied by litigating the case in Florida, where some of the defendants reside and where the wrongful death action was pending, as in our oft-cited earlier case, "the interest of the judicial system in the effective administration of justice does not appear to cut in either direction" here. *Ticketmaster,* 26 F.3d at 211.

### e. Pertinent Policy Arguments

This final "gestalt" factor requires us to consider the common interests of all sovereigns in promoting substantive social policies. Here, the most prominent policy implicated is the ability of a state to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors. *See Burger King,* 471 U.S. at 473, 105 S.Ct. at 2182. This policy assumes added importance in our age of advanced telecommunications, which has so facilitated the representation of geographically distant clients that it is not uncommon for a firm to represent a client without meeting him or her in person or traveling to the client's state of residence.

Although the concept of long-arm jurisdiction must adjust as technological advances render blurry the boundaries between the states, see *World–Wide Volkswagen,* 444 U.S. at 308–09, 100 S.Ct. at 585–86 (Brennan, J., dissenting), we must heed the warning

that "it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts." *Pickens v. Hess,* 573 F.2d 380, 387 (6th Cir. 1978) (quoting *Hanson v. Denckla,* 357 U.S. at 251, 78 S.Ct. at 1238). To permit the exercise of personal jurisdiction over the defendants in this case would require this Court to disregard that sage advice.

## IV. Conclusion

In review, the Sawtelles have demonstrated little more than a bare minimum, if that, with respect to the first two stages of the due process inquiry. The plaintiffs' showing of relatedness is weak because their claim for legal malpractice did not directly arise out of, nor was it related (in any meaningful way) to the law firms' contacts with New Hampshire. Moreover, the law firms' telephone communications and correspondence into the forum did not represent a "purposeful availment" by the firms of the privilege of conducting business activities in New Hampshire. The law firms did not meaningfully invoke the benefits and protections of the laws of New Hampshire and the haling of such defendants into New Hampshire's courts was not foreseeable.

The frailty of plaintiffs' showings on relatedness and purposeful availment is not strengthened as a result of our consideration of the reasonableness of an exercise of jurisdiction over the defendants by a New Hampshire court. Although the exercise of jurisdiction may be proper when a borderline showing of relatedness and purposeful availment is supported by an especially solid showing of reasonableness, see *Ticketmaster,* 26 F.3d at 210, our "gestalt" analysis in the instant case fails to reveal any such fortification. Accordingly, the decision of the district court is

**AFFIRMED.**