<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 99-1254

                    PHILLIPS EXETER ACADEMY,

                     Plaintiff, Appellant,

                               v.

              HOWARD PHILLIPS FUND, INC., ET AL.,

                     Defendants, Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF NEW HAMPSHIRE

         [Hon. Paul J. Barbadoro, U.S. District Judge]

                             Before

                     Selya, Circuit Judge,
                                
                Coffin, Senior Circuit Judge,
                                
                  and Lipez, Circuit Judge.
                                
                                
                                
    Harvey J. Wolkoff, with whom John H. Mason, Robert L. Kilroy,
Ropes & Gray, Jack B. Middleton, Rachel A. Hampe and McLane, Graf,
Raulerson & Middleton were on brief, for appellant.
    Richard B. Couser, with whom Roy S. McCandless, Orr & Reno,
P.A., Gregory Presnell and Akerman, Senterfit & Edison, P.A. were
on brief, for appellees.

November 19, 1999

                                

 SELYA, Circuit Judge.  This appeal presents a
jurisdictional tangle.  The seeds for the underlying litigation
were sown when the late Howard Phillips (Phillips or the testator)
bequeathed all the stock in a profitable Florida-based real estate
development company, Dr. Phillips, Inc. (the Company), to the
Howard Phillips Fund (the Fund), upon the condition that the Fund
share the profits with Phillips Exeter Academy (Exeter), a private
secondary school located in New Hampshire.  Over time, Exeter
concluded that the Company and the Fund had short-shrifted it.  
When a disenchanted Exeter subsequently sued in New Hampshire's
federal district court, the court determined that it lacked
personal jurisdiction over the named defendants and dismissed the
action.  Exeter appeals.  We affirm.
I.  BACKGROUND
 Phillips resided in Florida and executed his will there.  
When he died in 1979, he held a power of appointment over all the
shares in the Company.  His will directed that the stock be offered
in turn to a series of family-sponsored charitable foundations.  
After one declined the gift, the Fund accepted it.
 The testator was an alumnus of Exeter and a stalwart
supporter of his alma mater.  His will obligated the Fund, as a
condition to its receipt of the Company's stock, to vote the stock
for the election of an Exeter representative to the Company's
governing board and to pay Exeter "Five (5%) percent of the net
income from such stock . . . but not for more than twenty (20)
years after [Phillips's] death," along with "Five (5%) percent of
the net proceeds of the stock" if and when sold within the 20-year
window.  Phillips's will further provided that "any right to future
income shall cease" upon a sale of the stock.  Although these were
the only firm conditions attached to the bequest, the testator
expressed his hope that the recipient of the stock would continue
to focus its charitable efforts on the causes and institutions it
had favored when he was active in its direction and that it would
give Exeter 5% of its own net income annually for 20 years.  The
Fund, as a matter of practice, apparently fulfilled the first of
these velleities, continuing to devote most of its resources to
familiar Florida charities (including Florida chapters of national
organizations).  But for aught that appears, the Fund showed no
interest in channeling more money to Exeter.
 Soon after the Florida probate proceedings were
completed, two things happened.  First, the Fund, acting at
Exeter's behest, elected John Emery   an Exeter alumnus who lives
and works in New York   to the Company's board.  Second, H.E.
Johnson, who then served as the chief executive officer of both the
Fund and the Company   the two entities were under common control,
and remained so thereafter   consulted Emery about the possibility
of a lump-sum commutation of the Fund's present and future
obligations to Exeter.  Exeter turned a deaf ear to this entreaty,
and the Fund proceeded to send checks annually to Exeter in New
Hampshire, each equaling 5% of the dividend declared by the Company
for the year in question.
 Another settlement overture occurred in 1992, when
Johnson's successor, James Hinson, visited the school's headmaster
in New Hampshire.  This visit   which marked the only time that an
official of either defendant set foot in New Hampshire to conduct
Exeter-related business   proved unavailing.  The next year, Hinson
again unsuccessfully proposed a settlement, this time by letter.
 The Fund and the Company both altered their corporate
forms in the years following the testator's demise.  In 1980, the
Fund converted from a private family foundation (known as the Della
Phillips Foundation) to its present incarnation as a charitable
support organization (known as the Howard Phillips Fund).  This
maneuver enabled it to hold the Company's stock indefinitely,
without risk of escalating tax penalties.  Compare 26 U.S.C.  4943
(describing tax consequences for private foundations with "excess
business holdings"), with id.  509(a)(3) (excluding charitable
support organizations from the definition of "private foundation").  
In 1997, management merged the Company, until then an ordinary
business corporation, into a newly established Delaware nonprofit
corporation of the same name, with the result that the Fund became
the sole member of the Company rather than its sole stockholder.  
Despite the conversion of its stock interest to a membership
interest, the Fund made no contemporaneous payment to Exeter.
 Exeter received its next annual check   an unusually
large one, geared to the Company's net income, rather than to its
annual dividend   from the Company instead of the Fund.  Shortly
thereafter, Exeter filed suit, claiming that the Fund and the
Company were liable in both tort and contract because (1) the  
transmitted payments, computed by the Fund on the basis of 5% of
the Company's annual dividends, fell well short of the Fund's
obligation to pay Exeter 5% of the Company's annual income; (2) the
restructuring that had occurred was designed to thwart the
testator's intention that the Fund sell the stock within 20 years
and deliver 5% of the net sale proceeds to Exeter; and (3) in all
events, when the Fund exchanged its stock ownership for a
membership interest, it should have paid Exeter 5% of the Company's
value.  The district court did not address the substance of these
allegations but, rather, granted the Fund's and the Company's joint
motion to dismiss the action for want of personal jurisdiction.  
See Fed. R. Civ. P. 12(b)(2).  This appeal ensued.
II.  ANALYSIS
 New Hampshire's long-arm statute reaches to the full
extent that the Constitution allows.  See Phelps v. Kingston, 536
A.2d 740, 742 (N.H. 1987); Computac v. Dixie News Co., 469 A.2d
1345, 1348 (N.H. 1983).  Aware of this reality, the court below
sensibly focused on federal constitutional standards, and the
parties   who agree on little else   have briefed the appeal in
those terms.  Thus, we proceed directly to the constitutional
inquiry.
 The Due Process Clause prohibits a court from imposing
its will on persons whose actions do not place them in a position
where they reasonably can foresee that they might be called to
account in that jurisdiction.  See World-Wide Volkswagen Corp. v.
Woodson, 444 U.S. 286, 297 (1980).  Although this regime is
grounded in principles of fundamental fairness, it is written more
in shades of grey than in black and white.  See Burger King Corp.
v. Rudzewicz, 471 U.S. 462, 486 n.29 (1985); United Elec., Radio &
Mach. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st
Cir. 1992).
 The accepted mode of analysis for questions involving
personal jurisdiction concentrates on the quality and quantity of
the potential defendant's contacts with the forum.  See
International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  
Thus, a defendant who has maintained a continuous and systematic
linkage with the forum state brings himself within the general
jurisdiction of that state's courts in respect to all matters, even
those that are unrelated to the defendant's contacts with the
forum.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466
U.S. 408, 414 (1984); Donatelli v. National Hockey League, 893 F.2d
459, 462-63 (1st Cir. 1990).  Short of general jurisdiction, a
court still may hear a particular case if that case relates
sufficiently to, or arises from, a significant subset of contacts
between the defendant and the forum.  See Helicopteros, 466 U.S. at
414; Donatelli, 893 F.2d at 462-63.  Exeter has never claimed that
the Fund and the Company are subject to the general jurisdiction of
New Hampshire's courts.  Hence, it is the latter type of personal
jurisdiction   commonly called "specific jurisdiction"   that is at
issue here.
 The inquiry into specific jurisdiction lends itself to a
tripartite analysis.  See Massachusetts Sch. of Law at Andover,
Inc. v. American Bar Ass'n, 142 F.3d 26, 35 (1st Cir. 1998);
Ticketmaster-N.Y., Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir.
1994).  First, an inquiring court must ask whether the claim that
undergirds the litigation directly relates to or arises out of the
defendant's contacts with the forum.  Second, the court must ask
whether those contacts constitute purposeful availment of the
benefits and protections afforded by the forum's laws.  Third, if
the proponent's case clears the first two hurdles, the court then
must analyze the overall reasonableness of an exercise of
jurisdiction in light of a variety of pertinent factors that touch
upon the fundamental fairness of an exercise of jurisdiction.  See
United Elec. Workers, 960 F.2d at 1088 (discussing this aspect of
the inquiry and dubbing these factors the "Gestalt factors").  An
affirmative finding on each of the three elements of the test is
required to support a finding of specific jurisdiction.
 The district court went no further than the first tier of
the test in ruling that neither defendant was subject to its
jurisdiction.  Concluding, on largely undisputed facts, that the
causes of action that Exeter pleaded did not arise out of or relate
sufficiently to the defendants' contacts with New Hampshire, the
court decided that Exeter had failed to make a prima facie showing
adequate to justify an exercise of specific jurisdiction.  We
review this decision de novo, see Foster-Miller, Inc. v. Babcock &
Wilcox Can., 46 F.3d 138, 147 (1st Cir. 1995), mindful that we are
not wedded to the lower court's reasoning, but may affirm the
judgment for any independent reason made manifest in the record,
see Hachikian v. FDIC, 96 F.3d 502, 504 (1st Cir. 1996).
 The district court made a painstakingly thoughtful
analysis.  Its methodology was to compile a list of the Fund's
activities in New Hampshire   transmitting checks into the state
once a year, sending a few letters to Exeter, and visiting Exeter
on one occasion in an effort to forge a settlement   and then to
explore the interrelationship between Exeter's claims and these
contacts.  The court made this exploration on a claim-by-claim
basis.  As to the contract claim, the court noted that the relevant
contract had been created in Florida (when the Fund accepted the
conditional bequest) and that, if the contract was breached, the
breach also occurred in Florida (where the Fund decided what
amounts would be disbursed to Exeter).  Turning to the tort claim,
the court could discern no causal connection between the Fund's New
Hampshire contacts and either the alleged breach of fiduciary duty
or the injury resulting therefrom.  Consequently, the court held
that none of Exeter's claims was sufficiently related to the Fund's
contacts with New Hampshire to warrant the exercise of personal
jurisdiction.
 We commend the lower court's decision to analyze the
contract and tort claims discretely.  Questions of specific
jurisdiction are always tied to the particular claims asserted.  
See United Elec. Workers, 960 F.2d at 1089 (stating that "the
defendant's in-state conduct must form an 'important, or [at least]
material, element of proof' in the plaintiff's case") (quoting
Marino v. Hyatt Corp., 793 F.2d 427, 430 (1st Cir. 1986)).  In
contract cases, a court charged with determining the existence vel
non of personal jurisdiction must look to the elements of the cause
of action and ask whether the defendant's contacts with the forum
were instrumental either in the formation of the contract or in its
breach.  See, e.g., id. at 1089-90; Jones v. Petty-Ray Geophysical,
Geosource, Inc., 954 F.2d 1061, 1068 (5th Cir. 1992); Papachristou
v. Turbines Inc., 902 F.2d 685, 686 (8th Cir. 1990) (en banc).  
Because the elements differ in a tort case, a court charged with
determining the existence vel non of personal jurisdiction must
probe the causal nexus between the defendant's contacts and the
plaintiff's cause of action.  See Nowak v. Tak How Invs., Ltd., 94
F.3d 708, 715-16 (1st Cir. 1996); Sawtelle v. Farrell, 70 F.3d
1381, 1390 (1st Cir. 1995).  Thus, the court below appropriately
drew a distinction between Exeter's contract and tort claims.  See
Mass. Sch. of Law, 142 F.3d at 35.
 Against this backdrop, we turn to Exeter's contentions
that the district court conflated the relatedness and purposeful
availment inquiries, and failed to recognize that, in gauging
relatedness, a defendant's contacts with the forum state are not
necessarily limited to moments of physical presence.  In Exeter's
view, the Fund's ongoing relationship with, and obligations to, a
New Hampshire beneficiary comprise contacts that satisfy the
relatedness requirement.
 To be sure, there is a natural blurring of the
relatedness and purposeful availment inquiries in cases (like this
one) in which the alleged contacts are less tangible than physical
presence; in such circumstances, an inquiring court must determine
the extent to which the defendant directed an out-of-state activity
at the forum state in order to ascertain whether the activity can
be termed a contact at all.  See, e.g., id. at 36.  This
determination bears at least a family resemblance to a
determination of whether a defendant purposefully availed himself
of the protections of the forum state.  Notwithstanding this
resemblance, however, the inquiries are different, see James Wm.
Moore, Moore's Federal Practice  108.42[2][a] (3d ed. 1999), and
we reject Exeter's contention that the district court confused
them.
 Exeter's principal argument along this line is that the
fiduciary relationship between the parties should itself have been
evaluated as a New Hampshire contact related to Exeter's claims.  
We agree with one premise that underlies this argument:  to be
constitutionally significant, forum-state contacts need not involve
physical presence.  See Burger King, 471 U.S. at 476.  We disagree,
however, with Exeter's attempt to invoke this premise here.  It is
not the relationship itself, but the content of the parties'
interactions that creates constitutionally significant contacts.  
Thus, "[t]he relatedness requirement is not met merely because a
plaintiff's cause of action arose out of the general relationship
between the parties; rather, the action must directly arise out of
the specific contacts between the defendant and the forum state."  
Sawtelle, 70 F.3d at 1389.  The district court adhered to this rule
and correctly focused on the forum-based activities surrounding the
Fund's relationship with Exeter   without regard to whether they
entailed physical presence   rather than on the relationship
itself.
 Exeter's claim that this approach ignores the teachings
of Burger King lacks force.  As Exeter points out, Burger King
upheld the Florida courts' exercise of jurisdiction over a Michigan
franchisee of a Florida corporation in part because of the parties'
"carefully structured 20-year relationship that envisioned
continuing and wide-reaching [Florida] contacts."  471 U.S. at 480.  
But this snippet does not paint the whole picture:  the Burger King
Court made clear that the mere existence of a contractual
relationship between an out-of-state defendant and an in-state
plaintiff does not suffice, in and of itself, to establish
jurisdiction in the plaintiff's home state.  See id. at 478-79.  
Rather, "prior negotiations and contemplated future consequences,
along with the terms of the contract and the parties' actual course
of dealing . . . must be evaluated in determining whether the
defendant purposefully established minimum contacts within the
forum."  Id. at 479.  The district court's approach was faithful to
this instruction.
 We next proceed to the court's implementation of the
approach.  As we have indicated, the relevant interactions between
the parties and the proposed forum must be assayed in light of the
nature of the plaintiff's claim.  See United Elec. Workers, 960
F.2d at 1089.  For example, in  Hanson v. Denckla, 357 U.S. 235
(1958), the settlor had executed a trust indenture in Delaware,
naming a Delaware trustee who administered the trust corpus in that
state.  See id. at 238.  The settlor later moved to Florida, but
continued to receive payments from the trust.  See id. at 252.  She
also purported to exercise a power of appointment reserved in the
trust indenture.  See id. at 239.  Upon her death, certain legatees
sued the trustee in a Florida court, seeking to declare the
reservation invalid.  See id. at 240-42.  Because the plaintiffs'
claim focused on the validity vel non of the Delaware trust and the
power-of-appointment provision, the Court held that the claim did
not arise out of in-forum contacts even though the power of
appointment had been exercised in Florida by a Florida resident who
had been receiving regular payments there from the trustee.  See
id. at 251-52.  At the same time, however, the Court left open the
possibility that a different claim   one focused on the propriety
of the exercise of the power of appointment   might give rise to
jurisdiction over the trustee in Florida.  See id. at 253 & n.25.
 Hanson suggests that we must determine the focal point of
each of the plaintiff's claims and assess the interactions between
the defendant and the forum state through that prism.  Here,
however, regardless of whether this dispute is viewed as a breach
of contract case or a breach of fiduciary duty case, the same two
landmarks predominate:  the meaning of the testator's will and the
Fund's fulfillment of the obligations that it undertook coincident
to its acceptance of the bequest.  Most of the relevant
interactions (e.g., the execution of the will, the acceptance of
the bequest, and the payment decisions) occurred in Florida.  The
rest (e.g., the restructuring of the Company and the conversion of
the Fund's ownership interest to a membership interest) occurred in
Delaware.  From this vantage point, Exeter's claim to jurisdiction
in New Hampshire appears untenable.  See Bond Leather Co. v. Q.T.
Shoe Mfg. Co., 764 F.2d 928, 934 (1st Cir. 1985).
 Exeter has another string to its jurisdictional bow.  
Notwithstanding that the formation of the relationship had nothing
to do with New Hampshire, it asseverates that the consequences of
the relationship involved contacts with New Hampshire sufficient to
subject the Fund to the jurisdiction of the New Hampshire courts.  
See Burger King, 471 U.S. at 479.  Because the payments transmitted
to New Hampshire were too niggardly, this thesis runs, the Fund's
breach both of the contract and of its fiduciary duty occurred in
New Hampshire.
 As to Exeter's tort claim, we think that this reasoning
is specious.  A breach of fiduciary duty occurs where the fiduciary
acts disloyally.  See Young v. Colgate-Palmolive Co., 790 F.2d 567,
570-71 (7th Cir. 1986); McFarland v. Yegen, 699 F. Supp. 10, 13
(D.N.H. 1988).  Consequently, any breach of fiduciary duty in this
case occurred in Florida and arose when the Fund allegedly computed
the payments in artificially low amounts.  This means that the
receipt of payment was merely an in-forum effect of an extra-forum
breach and, therefore, inadequate to support a finding of
relatedness.  See Mass. Sch. of Law, 142 F.3d at 36; Sawtelle, 70
F.3d at 1390-91; cf. Burger King, 471 U.S. at 474 (reiterating that
the foreseeability of causing injury in another state, without
more, is not a sufficient benchmark for exercising personal
jurisdiction in that state).  This makes eminent sense, for the
receipt of payment in New Hampshire could not conceivably have
caused the breach of the duty of loyalty of which Exeter complains.  
See Ticketmaster, 26 F.3d at 207 (explaining that a main purpose of
the relatedness requirement is to ensure that "the element of
causation remains in the forefront of the due process
investigation").   
 Exeter's contractual claim requires a different analysis.  
Although the injury resulting from a breach of fiduciary duty might
be said to be complete when the fiduciary disregards his duty, see
Young, 790 F.2d at 570, a contract arguably is breached where a
promisor fails to perform, see, e.g., Papachristou, 902 F.2d at
686.  Indeed, courts repeatedly have held that the location where
payments are due under a contract is a meaningful datum for
jurisdictional purposes.  See, e.g., Burger King, 471 U.S. at 480;
Ganis Corp. v. Jackson, 822 F.2d 194, 198 (1st Cir. 1987).  Even
so, that fact alone does not possess decretory significance.  See
Kulko v. Superior Court, 436 U.S. 84, 93, 97 (1978) (finding no
personal jurisdiction in California as to contractual claims
against a father to modify a custody agreement entered into in New
York, even though the agreement provided for support payments to
the mother and minor children in California); Hanson, 357 U.S. at
252; Kerry Steel, Inc. v. Paragon Inds., 106 F.3d 147, 152 (6th
Cir. 1997); see also Scullin Steel Co. v. National Ry. Utiliz.
Corp., 676 F.2d 309, 315 (8th Cir. 1982).  Exeter offers no
convincing argument as to why the location to which payments were
sent is entitled to greater suasion here than in these cases.
 In the last analysis, we agree with the district court
that, as to both claims, Exeter has failed to make a prima facie
showing of relatedness.  We hasten to add, however, that even if
the New Hampshire payments sufficed to show relatedness in respect
to Exeter's breach-of-contract claim   the only close question
among those discussed thus far   the lack of purposeful availment
nevertheless would defeat jurisdiction.  We explain briefly.
 The purposeful availment test requires us to consider
whether the Fund's contacts with New Hampshire "represent a
purposeful availment of the privilege of conducting activities in
[New Hampshire], thereby invoking the benefits and protections of
[its] laws and making the defendant[s'] involuntary presence before
the state's courts foreseeable."  United Elec. Workers, 960 F.2d at
1089.  Exeter argues that because the Fund knowingly accepted the
conditions imposed upon the bequest, it in effect reached out to
Exeter in New Hampshire.  But to make a prima facie showing of
purposeful availment, it is not enough to prove that a defendant
agreed to act as the trustee of a trust that benefitted a resident
of the forum state.  See Sawtelle, 70 F.3d at 1392, 1394 (holding
that lawyers' acceptance of an attorney-client relationship with
New Hampshire clients was not purposeful availment vis--vis New
Hampshire).  Without evidence that the defendant actually reached
out to the plaintiff's state of residence to create a relationship
 say, by solicitation, see, e.g., Nowak, 94 F.3d at 716-17   the
mere fact that the defendant willingly entered into a tendered
relationship does not carry the day.
 Even if a defendant's contacts with the forum are deemed
voluntary, the purposeful availment prong of the jurisdictional
test investigates whether the defendant benefitted from those
contacts in a way that made jurisdiction foreseeable.  See
Ticketmaster, 26 F.3d at 207.  Here, the Fund received a very large
bequest as a result of its acceptance of the obligation to make
certain payments to Exeter, but this benefice did not flow from any
relationship with New Hampshire.  Indeed, the annual payments sent
to Exeter in New Hampshire comprise the Fund's only pertinent
contacts with that state   and there is not so much as a hint that
the Fund benefitted in any way from the protections of New
Hampshire law in making these payments.  See Savin v. Ranier, 898
F.2d 304, 307 (2d Cir. 1990); see also Bond Leather, 764 F.2d at
934.  The very exiguousness of these contacts suggests that the
Fund could not reasonably have foreseen its susceptibility to suit
in a New Hampshire court.  Hence, there was no purposeful
availment.  See Hanson, 357 U.S. at 253; Mass. Sch. of Law, 142
F.3d at 37.
III.  CONCLUSION
 We need go no further.  Neither the Fund nor the Company
has contacts with New Hampshire that are sufficiently related to
the claims asserted in this case to permit the exercise of in
personam jurisdiction.  Moreover, such contacts as do exist and
arguably relate to the plaintiff's claims fail to evince purposeful
availment of the benefits and protections of New Hampshire law.  
For these reasons, an exercise of jurisdiction in New Hampshire
would offend due process.

Affirmed.

</body>

</html>