**Christopher Duran COMER, Individually and as Executor of the Estate of Billie Tackett Comer, dec'd., Plaintiff**

v.

**Nathaniel Crichton COMER, Sr., et al, Defendants**

**No. CIV.A. 03–30121–MAP.**

United States District Court, D. Massachusetts.

Dec. 2, 2003.

Steven L. Manchel, Davidson, Manchel & Brennan, LLP, Needham, MA, for Stuart Brazie, Quick & Reilly Inc., Defendants.

Patrick J. Markey, Robinson Donovan, P.C., Springfield, MA, for Murphy & Vicroy, PLLC, Joseph B. Murphy, Steven F. Vicroy, Nathaniel Crichton Comer, II, Sharon Felty–Comer, Nathaniel Crichton Comer, Sr., Defendants.

Joseph H. Reinhardt, The McCabe Group, PC, Boston, MA, for Baker & Hostetler LLP, Rodney L. Drinnon, Defendants.

Tracey E. Spruce, Davidson, Manchel & Brennan, LLP, Newton, MA, for Quick & Reilly Inc., Stuart Brazie, Defendants.

*ORDER REGARDING REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFF'S MOTION FOR DECLARATIVE AND INJUNCTIVE RELIEF*

(Docket Nos. 11, 13, 15, 22, 39 & 44)

PONSOR, District Judge.

Upon *de novo* review, the Report and Recommendation of Magistrate Judge Kenneth P. Neiman dated November 3, 2003 is hereby adopted, without objection. The defendants' Motions to Dismiss (Docket Nos. 11, 13, 15, 22 and 39) are hereby ALLOWED; the plaintiff's Motion for Declarative and Injunctive Relief (Docket No. 44) is hereby DENIED. The file is ordered closed.

It is So Ordered.

REPORT AND RECOMMENDATION WITH REGARD TO DEFENDANTS' MOTIONS TO DISMISS (Document Nos. 11, 13, 15, 22 and 39) and PLAINTIFF'S MOTION FOR DECLARATIVE AND INJUNCTIVE RELIEF (Document No. 44)

NEIMAN, United States Magistrate Judge.

This case is the fourth lawsuit arising out of a family dispute over the estate of Billie Tackett Comer (hereinafter "Billie") who died in Kentucky on May 6, 1999. In the instant action, Massachusetts resident Christopher Duran Comer, Billie's son and the executor of her estate (hereinafter "Plaintiff"), proceeding pro se, alleges that other family members in Kentucky or Ohio—namely Billie's husband Nathaniel Crichton Comer, Sr. (hereinafter "Comer"), their other son Nathaniel Crichton Comer, II (hereinafter "Crichton"), and Crichton's wife Sharon Felty–Comer (hereinafter "Felty–Comer")—along with several out of state lawyers and a brokerage firm (collectively "Defendants"), have engaged in a scheme to defraud both him and the estate.

Currently at issue are numerous motions to dismiss the complaint for lack of personal jurisdiction. *See* Fed.R.Civ.P. 12(b)(2). One motion also argues that the complaint should be dismissed for improper venue, for lack of standing and for failing to state claims upon which relief may be granted. *See* Fed.R.Civ.P.

12(b)(3) and (6). For his part, Plaintiff has filed a motion seeking declaratory and injunctive relief.

The motions have been referred to this court for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B). For the reasons stated below, the court finds Defendants' personal jurisdiction arguments persuasive and, therefore, will recommend that the motions to dismiss be allowed on that basis. The court will further recommend that Plaintiff's motion for declaratory and injunctive relief be denied.

## I. BACKGROUND

The following facts come mainly from the complaint. However, since personal jurisdiction is at issue, the court has also looked at other documents supplied by the parties. *See Boit v. Gar–Tec Prods., Inc.,* 967 F.2d 671, 675, 681–82 (1st Cir.1992) (when faced with Rule 12(b)(2) motion, a plaintiff must go beyond the pleadings and affirmatively prove that sufficient contacts exist between the defendant and the foreign state) (citations omitted); *Callahan v. Harvest Bd. Int'l, Inc.,* 138 F. Supp 2d 147, 152–53 (D.Mass.2001) (unlike Rule 12(b)(6) motion, "[t]he consideration of materials outside the complaint is appropriate in ruling on a motion to dismiss for lack of personal jurisdiction") (citing cases).

The present action is the latest salvo in an ongoing family squabble over the proceeds of Billie's estate. The bulk of the estate is held in a brokerage account at a Cincinnati, Ohio, branch of Quick & Reilly, Inc. ("Q & R"), which was managed by Stuart Brazie ("Brazie"); both Q & R and Brazie are defendants. (See Document No. 2 ("Amended Complaint") ¶ 47; Document No. 16 ("Q & R's Brief") at 2.) The present lawsuit revolves around alleged in-

terference in the account by both Brazie and Crichton as well as alleged fraud by others, including Comer and Crichton, with respect to a settlement agreement. Before detailing the exact contours of the dispute, however, some background of the parties' sad and contentious imbroglio is in order. Further jurisdictional facts are described in the court's discussion below.

Billie died in Kentucky on May 6, 1999, at age 83. (Amended Complaint ¶ 12.) Soon thereafter, her blind 86 year old husband, Comer, began living at Crichton's home in Frankfort, Kentucky, until he could move into a nearby assisted living facility. (*Id.* ¶ 18.) Eventually, a dispute arose over Billie's estate and, in late 1999, Plaintiff, represented by counsel, filed suit against Comer in Kenton County, Kentucky. (*Id.* ¶¶ 24, 26.) On February 25, 2000, however, a two week emergency protective order was issued by the Kenton County court prohibiting Plaintiff, who lives in Belchertown, Massachusetts, from contacting Comer. (*Id.,* ¶ 17 and Exhibits B and C.) [1]

Meanwhile, Plaintiff, allegedly as executor of Billie's estate, removed personal property from her home and consigned it to an auction house in Milford, Ohio. (*Id.* ¶¶ 31, 34.) In response, Comer—then represented by Rodney Drinnon ("Drinnon") of the Ohio law firm Baker & Hostetler LLP ("B & H"), both of whom are named as defendants here—filed an Ohio probate action against the auction house in May of 2002 to prevent the property from being sold. (*Id.* ¶ 35 and Exhibit EE.) Subsequently, Plaintiff intervened as a defendant in the probate action, which intervention, in turn, caused Drinnon to contact Plaintiff by telephone and e-mail on March

---

**1.** Plaintiff acknowledges that he "has been under a psychiatrist's care since about September of 1999"—during which time he "has experienced severe depression and inability to sleep"—and, as recently as January of 2003, "had been thinking seriously about committing suicide." (*Id.* ¶¶ 234–36.)

25, 2003. (*Id.* ¶ 187 and Exhibit EE; Document No. 36 ("Drinnon's Second Affidavit") ¶ 4; Document No. 27 ("Plaintiff's Opposition to B & H's Brief") at 5.)

Jumping back in time: in July of 2001, Plaintiff rented a recreational vehicle in Connecticut and drove to Crestview, Kentucky. (Amended Complaint ¶ 74.) Once there, Plaintiff picked up two of Comer's friends, Henry Stark (age 102) and Nancy Wilkerson (in her 80s), and drove to Frankfort and picked up Comer. (*Id.* ¶¶ 75, 77.) The group then returned to Crestview and parked in Mr. Stark's driveway where Plaintiff questioned his father about his finances. (*Id.* ¶ 79). Ultimately, Comer signed documents ostensibly assigning his power of attorney to Plaintiff, settling Plaintiff's lawsuit and terminating a Jane Fitzpatrick as Comer's attorney. (*Id.* ¶ 84 and Exhibit O.) Several days later, Comer signed an additional document purporting to terminate Drinnon and Steven Eberly, also of B & H, as his counsel. (*Id.* ¶ 86 and Exhibit P.) Thereafter, on August 23, 2001, Comer signed a document purporting to create an irrevocable trust naming Plaintiff as trustee. (*Id.* ¶ 101 and Exhibit R.) Following a hearing in of 2001, a Kenton County judge held that Comer acted freely and voluntarily in discharging his attorneys and that Comer and Plaintiff had effectively withdrawn their claims against each other. (*Id.* ¶¶ 87, 88, 95 and Exhibit Q.)

Subsequently, Crichton retained Kentucky attorney Steven Vicroy ("Vicroy")—who has been sued here along with his partner, Joseph Murphy ("Murphy"), and their law firm, Murphy & Vicroy, PLLC ("M & V")—to represent Comer. (*Id.* ¶ 113.) Vicroy promptly filed suit on be-

half of Comer against Plaintiff in Franklin County, Kentucky. (*Id.* ¶¶ 113, 144.) That complaint alleged that Plaintiff exerted undue influence over Comer in executing the documents Comer signed while in the recreational vehicle. (*Id.* ¶¶ 144–45.) Apparently, Vicroy had Plaintiff served, by mail, with a copy of the summons and complaint at Plaintiff's Massachusetts home on February 13, 2002.

On January 23, 2003, Plaintiff, Comer, Crichton and Felty–Comer attended a mediation session in Middletown, Ohio, under the auspices of the Ohio Twelfth District Court of Appeals. (*Id.* ¶ 226.) At the end of the day, the parties signed a settlement agreement, which has subsequently been enforced by the Clermont County Court of Common Pleas. (Document No. 14 ("Crichton's Brief"), Exhibit 2.) Plaintiff now alleges that he was deceived and defrauded in the signing of the settlement agreement. (See Amended Complaint ¶ 281.)

Plaintiff initiated the present action on May 12, 2003. He filed an Amended Complaint on May 23, 2003, which has since been amended again. (See Electronic Order dated October 9, 2003.)[2] The complaint, as amended, consists of a rambling 351 paragraphs (involving scores of pages and numerous exhibits) without the benefit of any division into counts or claims. Winnowed to its essence, it appears that Plaintiff is alleging four causes of action: (1) that both Q & R and Brazie breached a contract and knowingly participated in fraud (Amended Complaint ¶ 326); (2) that Crichton, Drinnon, Vicroy and Brazie intentionally and knowingly misled Plaintiff with reckless disregard for the truth (*id.*

---

**2.** Specifically, the court stated the following in its October 9th electronic order: "Paragraph 321 of Plaintiff's 'Amended Complaint' filed on May 23, 2003, (considered by the court to still be the operative complaint), is

stricken and Paragraphs 326–29 are replaced by the language set forth on page 9 of Document No. 27, i.e., Plaintiff's Objection to Drinnon and Baker & Hostetler's Motion to Dismiss."

¶ 327); (3) that Comer, Crichton, Vicroy (and, apparently, by extension Murphy and M & V), Drinnon (and, apparently, by extension B & H), Brazie and Q & R engaged in a scheme to defraud Plaintiff and the estate (*id.* ¶ 328); and (4) that both Brazie and Q & R knowingly assisted and participated in a fiduciary breach (*id.* ¶ 329). Plaintiff's claims against Felty–Comer have been voluntarily dismissed. (See Document No. 21 ("Plaintiff's Opposition to Crichton's Motion") at 8.)

## II. DISCUSSION

The court will begin by examining the personal jurisdiction standards. It will then evaluate whether, under these standards, each defendant is subject to the court's jurisdiction. As will be explained, the court believes that not one of the Defendants is subject to personal jurisdiction in Massachusetts and, therefore, will recommend that each of the motions to dismiss be granted on that basis.

### A. *Personal Jurisdiction Standards*

■ "When embarking upon the fact-sensitive inquiry of whether a forum may assert personal jurisdiction over a defendant, the court's task is not a rote, mechanical exercise." *Sawtelle v. Farrell,* 70 F.3d 1381, 1388 (1st Cir.1995) (citations and internal quotation marks omitted). *See also id.* ("Divining personal jurisdiction is more an art than a science.") (citations and internal quotation marks omitted); *Good Hope Indus., Inc. v. Ryder Scott Co.,* 378 Mass. 1, 389 N.E.2d 76, 78 (1979) ("Generally speaking, 'inquiries into whether the exercise of personal jurisdiction is permissible in a particular case are sensitive to the facts of each case.'") (quoting *Great W. United Corp. v. Kidwell,* 577 F.2d 1256, 1266 (5th Cir.1978)). Rather,

the court is bound to pursue a two-part inquiry: (1) whether the plaintiff has demonstrated that the assertion of jurisdiction is authorized by statute, and, if authorized, (2) whether such assertion comports with the restraints imposed by the Due Process Clause of the United States Constitution. *See Sawtelle,* 70 F.3d at 1387; *Foster–Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 144 (1st Cir.1995).

With regard to the first part of the inquiry, the law of the forum state applies. *Sawtelle,* 70 F.3d at 1387. In relevant part, Massachusetts' long-arm statute (hereinafter "section 3") provides as follows:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's

(a) transacting any business in this commonwealth; [or]

.        .        .        .        .

... (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth . . . .

Mass. Gen. L. ch. 223A, § 3(a), (d).[3]

As for the second part of the inquiry, the First Circuit has designated "three distinct components" in the due process analysis, "relatedness, purposeful availment (sometimes called 'minimum contacts'), and reasonableness," *Foster–Miller,* 46 F.3d at 144, each of which must be satisfied, *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 206 (1st Cir.1994). The relatedness component—"that a suit

---

**3.** There are other parts of section 3 which could conceivably be relevant here, e.g., subsection (b) which concerns contracts to supply services or things, but Plaintiff's papers mention only subsections (a) and (d). The court limits itself likewise.

arise out of, or be related to" defendant's forum activities—"ensures that the element of causation remains in the forefront." *Id.* at 206, 207. The "purposeful availment" component is designed to assure that personal jurisdiction is not premised solely upon a defendant's "random, isolated, or fortuitous" contacts with the forum. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). In other words, the plaintiff must demonstrate that the defendant's contacts "represent a purposeful availment of the privilege of conducting activities in [Massachusetts], thereby invoking the benefits and protections of its laws and making the defendant's involuntary presence before [a Massachusetts] court foreseeable." *Pritzker v. Yari,* 42 F.3d 53, 61 (1st Cir.1994) (citation and internal quotation marks omitted).

Finally, with regard to the "reasonableness" component, the assertion of jurisdiction over a defendant must "not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). *See Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 113, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). In analyzing this component, the court typically must weigh five elements, often referred to as the "gestalt factors": "(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common

interests of all sovereigns in promoting substantive social policies." *Foster–Miller,* 46 F.3d at 150.

### B. *Application*

With these standards in mind, the court will address Defendants' various personal jurisdiction arguments. The court, as necessary, will focus on both long-arm provisions under which Plaintiff claims to be proceeding—subsections (a) and (d) of section 3—and any relevant due process concerns with respect to each defendant.[4]

#### 1. *Vicroy, Murphy and M & V*

■ In the court's view, there is no personal jurisdiction in this forum over Vicroy, Murphy or their law firm, M & V. As they each aver, Vicroy and Murphy have never been to Massachusetts and neither they nor their firm have ever had any business or other relationship within the Commonwealth. Nor is there any support for Plaintiff's assertion that "lawyers occupy a special category in the business world." (Document No. 19 ("Plaintiff's Opposition to M & V's Motion") at 4.) To be sure, Plaintiff argues that Vicroy subjected himself—and by extension Murphy and the firm—to this court's jurisdiction by having Comer's complaint served by mail on Plaintiff in Massachusetts in February of 2002. However, this argument fails for a variety of reasons.

For one thing, Plaintiff's "service of process" argument, like many of his other assertions, is unsupported by any caselaw. More importantly, the argument flies in the teeth of the Massachusetts long-arm statute insofar as the instant action is obviously not one "arising from" the prior service. Mass. Gen. L. ch. 223A, § 3. True,

---

4. In addition, the court notes that it has considered every one of Plaintiff's multiple submissions, including several video tapes, even though many are not pled with the precision typically required by this court. *See Haines v.*

*Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (observing that pro se submissions, "however inartfully pleaded," are held "to less stringent standards than formal pleadings drafted by lawyers").

Plaintiff might not have filed this action "but for" the prior suit. *See Tatro v. Manor Care, Inc.,* 416 Mass. 763, 625 N.E.2d 549, 553 (1994) (focusing on "but for" causation in "arising from" analysis). However, there is absolutely nothing linking Vicroy's service of process in that earlier suit to this action.

In addition, there is no support for Plaintiff's proposition, with respect to subsection (a) of the long-arm statute, that an attorney's service of a complaint in a separate action constitutes "transacting business" in the forum state. Similarly, with respect to subsection (d), both Vicroy and Murphy aver, without dispute by Plaintiff, that neither they nor their firm "has ever solicited business in Massachusetts[,] ... engaged in any persistent course of conduct in Massachusetts[,] ... [or] derived any revenue from goods used or consumed or services rendered in Massachusetts." (Document No. 12 ("M & V's Brief"), Exhibit 3 ¶¶ 22–24 and Exhibit 4 ¶¶ 19–21.)[5]

Further, Plaintiff's service of process argument fails the due process test. As indicated, the instant action is clearly not "related to" the service of Comer's complaint in the previous suit. Moreover, Vicroy and Murphy did not "purposefully avail" themselves of Massachusetts, i.e., it was not reasonably foreseeable that they or their firm would be haled into this forum simply by virtue of Vicroy's having an unrelated complaint served here. *See Ticketmaster,* 26 F.3d at 207 (noting that one of the cornerstones upon which the purposeful availment component rests is

foreseeability). For all these reasons, therefore, the court will recommend that the motion to dismiss brought by Vicroy, Murphy and M & V be allowed.

### 2. *Drinnon*

Plaintiff has also offered scant evidence linking Drinnon to this forum. To be sure, Plaintiff alleges that Drinnon contacted him by telephone and e-mail on March 25, 2003, and that this was "just the tip of a sixteen-month-long iceberg of contacts." (Plaintiff's Opposition to B & H's Brief at 5.) Ostensibly, Drinnon also contacted another Massachusetts resident who, on July 11, 2001, witnessed Comer sign a document terminating Drinnon as Comer's attorney. (*Id.*)

Plaintiff, however, does not make a subsection (a) argument with respect to Drinnon. Instead, he alleges that personal jurisdiction over Drinnon is warranted pursuant to subsection (d) of the Massachusetts long-arm statute. Unfortunately for Plaintiff's cause, however, he offers nothing to counter Drinnon's affidavit that he has "never been licensed to practice law in the Commonwealth of Massachusetts" and that, in fact, he has "never stayed overnight in ... Massachusetts for either business or pleasure." (Document No. 24 ("Drinnon's First Affidavit") ¶¶ 4, 6.) *See Aub v. Technicolor Entm't Servs.,* 224 F. Supp 2d 371, 373 (D.Mass.2002) (holding that subsection (a) does not confer personal jurisdiction where the non-resident's contacts with Massachusetts were purely incidental to the transaction).[6] It is also

---

**5.** Nor have they "ever caused tortious injury by any act or omission in the State of Massachusetts." (*Id.,* Exhibit 3 ¶ 21 and Exhibit 4 ¶ 18.) The fact that Plaintiff may have purportedly felt "economic consequences" in Massachusetts as a result of Vicroy or Murphy's actions is not enough to satisfy the "tortious injury" requirement of subsection (d). *See United States v. Swiss Am. Bank, Ltd.,*

191 F.3d 30, 37–38 (1st Cir.1999) (citation omitted).

**6.** To his credit, Drinnon acknowledges that he has thrice flown through Boston "in transit to Portland, Maine, for pleasure" and that once, in 1999, he "defended a deposition that took place at Logan Airport in a lawsuit pending in the Ohio Common Pleas Court." (*Id.* ¶ 6.) Plaintiff, however, has not argued that these

undisputed that Drinnon's isolated contacts with Plaintiff himself actually came "as a result of [Plaintiff's] motion to intervene as a party defendant" in the Ohio probate litigation. (Drinnon's Second Affidavit ¶ 4.) Accordingly, subsection (d) does not apply. *See, e.g., Lyle Richards Int'l, Ltd. v. Ashworth, Inc.,* 132 F.3d 111, 114 (1st Cir.1997) (observing that "arising from" question turns on whether the *defendant* took the first step in contacting the Commonwealth) (emphasis added; citation and internal quotation marks omitted).

Since personal jurisdiction over Drinnon is not warranted by the long-arm statute, there is no need to consider due process principles. Yet even were such principles to be considered, there is no indication that Drinnon purposefully availed himself of this forum. Moreover, as Drinnon points out, the due process cases Plaintiff cites are either inapposite or actually supportive of Drinnon's, not Plaintiff's, position. *See, e.g., Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 62 (1st Cir.2002) (observing that purposeful availment is a jurisdictional predicate); *Sonnabend v. Sorrentino,* 866 F.Supp. 651, 652 (D.Mass.1994) (establishing personal jurisdiction over defendant who shipped forged painting into the forum for sale and released the painting into the forum after the sale); *A–Connoisseur Transp. Corp. v. Celebrity Coach, Inc.,* 742 F.Supp. 39, 43 (D.Mass.1990) (holding that a "one-shot" transaction might justify personal jurisdiction, but "the cause of action must arise from that business"); *Morrill v. Tong,* 390 Mass. 120, 453 N.E.2d 1221, 1227–30 (1983) (finding lack of jurisdiction over defendant who maintained Navy dependent ID card and delivery of support payments in Massachusetts, sent letters, gifts and cards to his children in Massa-

chusetts and made two trips to the commonwealth of one and four months duration). Finally, the court finds wanting Plaintiff's argument that, simply because Drinnon (like Vicroy) is an attorney, the personal jurisdiction prerequisites ought to be waived. The court, accordingly, will recommend that Drinnon be dismissed.

### 3. *B & H*

As for B & H, Drinnon, on its behalf, avers without dispute by Plaintiff that "B & H does not now nor never [sic] has had a branch office in Massachusetts." (Drinnon's First Affidavit ¶ 8.) Nonetheless, Plaintiff argues that B & H is subject to personal jurisdiction in this forum because of its internet presence, namely, B & H's "passive" website (www.bakerlaw.com), its listing on an "interactive" Martindale–Hubbell internet service (www.lawyers.com), and the fact that both websites are accessible by Massachusetts internet users. In the court's opinion, Plaintiff is too clever by half.

■ Neither the United States Supreme Court nor, it appears, any court within this circuit has held that a mere internet presence, without more, establishes personal jurisdiction. For its part, this court has stated that it would not find the existence of personal jurisdiction based solely on web listings such as the ones at issue here. *See Back Bay Farm, LLC v. Collucio,* 230 F.Supp 2d 176, 185 n. 10 (D.Mass.2002). Other judges in this district have made similar observations. *See, e.g., Merced v. JLG Indus., Inc.,* 170 F. Supp 2d 65, 72 (D.Mass.2001); *Callahan,* 138 F. Supp 2d at 158–59, 168; *Hasbro, Inc. v. Clue Computing, Inc.,* 994 F.Supp. 34, 40 (D.Mass. 1997); *Digital Equip. Corp. v. AltaVista Tech., Inc.,* 960 F.Supp. 456, 471 (D.Mass. 1997); *Scansoft, Inc. v. Am. Future Tech.,*

additional, fortuitous contacts somehow subject Drinnon to personal jurisdiction in this

forum. Nor could he since the present action does not "aris[e] from" these contacts.

*Inc.*, C.A. No. 02–12455–MLW (Mem. & Order dated Aug. 28, 2003). There is nothing distinguishing this matter from this consistent line of cases.

For one thing, the B & H website is "passive"—i.e., it only posts information for those who are interested—and, admittedly, makes no mention of any ties to Massachusetts. *See, e.g., Callahan*, 138 F.Supp.2d at 158–59, 168 (website that makes no mention of any ties between defendant and Massachusetts, is not interactive and does not solicit business in Massachusetts is an insufficient basis on which to establish jurisdiction). *See also Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp. 1119, 1124 (W.D.Pa.1997) (concluding that "passive" pages do not provide independent grounds for the exercise of personal jurisdiction); *Hasbro*, 994 F.Supp. at 40 (applying *Zippo* ). In addition, there appears to be no case holding that personal jurisdiction exists over a law firm simply because it is a participant in a legal search engine such as www.lawyers.com. Any other result would belie common sense and the power of the internet as a research tool. *See, e.g., Back Bay Farm*, 230 F. Supp 2d at 185 n. 10.[7]

In short, the court believes that B & H's website, even when combined with its listing on the Martindale–Hubbell service, does not constitute "transacting business in this commonwealth" under subsection (a), "regularly solicit[ing] business" in Massachusetts under subsection (d), or "purposefully availing" itself of this forum in accord with due process. As importantly, there is absolutely no evidence that this case "aris[es] from" or is in any way "related to" these internet connections or that the connections were somehow used to specifically target Plaintiff in Massachusetts. *See* Olin, 23 W. New Eng. L.Rev. at 259 (arguing that the concept of "targeting"—how the web activity focuses on the plaintiff in the forum—"provide[s] a workable formula for resolving most personal jurisdiction Internet issues within the District of Massachusetts"). Accordingly, the court will recommend that B & H be dismissed.

### 4. *Crichton and Comer*

In many ways, Plaintiff's jurisdictional arguments with respect to his brother, Crichton, and his father, Comer, are derivative of other arguments already discussed. For example, Plaintiff argues that Crichton helped to retain Vicroy who, in turn, had Plaintiff served with Comer's complaint in Massachusetts and that Drinnon was acting as Crichton and Comer's agent when he called and e-mailed Plaintiff on March 25, 2003. For the reasons stated above, the court suggests that these arguments be rejected.

---

**7.** *See also* Robert W. Hamilton & Gregory A. Castanias, *Tangled Web: Personal Jurisdiction and the Internet*, 24 No. 2 LITIG. 27, 34 ("If, in order to avoid the risk of being haled into [every] court across the country, you must limit your company's use of the Web to simply a passive, static Website, then why bother?"); American Bar Ass'n Global Cyberspace Jurisdiction Project, *Achieving Legal and Business Order in Cyberspace: A Report on Global Jurisdiction Issues Created by the Internet*, at 60 n. 1 (July 10, 2000), at http://w ww.abanet.org/buslaw/cyber/initiatives/draft.rtf ("If each web site subjected its sponsor to global jurisdiction, many would forego use of the technology for fear of its secondary costs."); *Cf. Digital Equip. Corp.*, 960 F.Supp. at 471 (finding it "troubl[ing] . . . to force corporations that do business over the Internet, precisely because it is cost-effective, to now factor in the potential costs of defending against litigation in each and every state"). *See generally* Nathan A. Olin, *The A–B–C–s of Targeting: A Formula for Resolving Personal Jurisdiction–Internet Issues Within the District of Massachusetts*, 23 W. New. Eng. L.Rev. 237, 251–55 (2002) (describing the current "movement . . . to look deeper than the mere level of inactivity or passivity of a particular website").

■ The court also suggests rejection of an additional argument Plaintiff makes with respect to Crichton, namely, that he personally engaged in a "persistent course of conduct" under subsection (d) of section 3 insofar as he sent Plaintiff two gift magazine subscriptions in 1998 or 1999. Again, Plaintiff has offered no caselaw to support this novel assertion. The court's own research, forced upon it by this pro se litigant's shotgun approach, indicates that Crichton's sending Plaintiff two magazine subscriptions does not even come close to constituting a "persistent course of conduct" under subsection (d). *Cf. Pizarro v. Hoteles Concorde Int'l,* 907 F.2d 1256, 1259 (1st Cir.1990) (defendant's advertising in forum state newspaper had no connection to act causing injury and, therefore, was insufficient to establish personal jurisdiction); *Whistler Corp. v. Solar Electronics, Inc.,* 684 F.Supp. 1126, 1130–31 (D.Mass.1988) (holding that to fall within subsection (d), the defendant must cause tortious injury to the plaintiff in Massachusetts while regularly doing or soliciting business, or deriving substantial revenue from services used or consumed in Massachusetts). Nor does Plaintiff address the undisputed fact that Crichton, a life-long resident of Kentucky and an employee of that state, has visited Massachusetts only three times in the last thirty years. (See Crichton's Brief, Exhibit 3 ¶¶ 6, 7, 25–31.)

■ Similarly, the court suggests rejection of Plaintiff's final argument with respect to Comer: that, pursuant to subsection (a), Comer "transacted business" in the Commonwealth on July 11, 2001, when he fired his Kentucky attorney while traveling in Massachusetts. Again, there is simply no support for Plaintiff's generalized assertion that this random, unrelated contact satisfies either section 3 or the Due Process Clause. Moreover, Plaintiff does not address the undisputed fact that Comer has only been in Massachusetts three times in his entire life. (Document No. 40 ("Comer's Brief"), Exhibit 3 ¶¶ 5, 19–21, 37.) Accordingly, the court will recommend that both Crichton's and Comer's motions to dismiss be allowed.

### 5. *Brazie*

Except for identifying Brazie as an employee of Q & R, Plaintiff makes no particularized showing that personal jurisdiction over him is authorized by either section 3 or the Due Process Clause. Indeed, it is undisputed that, in his entire life, Brazie has only "visited Massachusetts once, for one night, more than three years ago, when [he] was working for an employer other than [Q & R]" and that his "visit had nothing to do with [Q & R] business." (Q & R's Brief, Exhibit A ¶ 3.) Accordingly, the court will recommend that Brazie be dismissed from this action.

### 6. *Q & R*

The allegations with respect to Q & R are a little less diaphanous. In the end, however, the court believes that, as with Brazie and the other defendants, Plaintiff has not sustained his burden of proving that sufficient contacts were made by Q & R to Massachusetts with respect to this suit such that this court's exercise of personal jurisdiction over Q & R is warranted.

■ With regard to the Massachusetts long-arm statute, Q & R concedes that it "maintains offices and provides services in Massachusetts to Massachusetts residents." (Q & R Brief at 5.) Plaintiff, however, has not demonstrated how the present action is one "arising from" such transactions as required by both subsections (a) and (d). As the court has noted, the "arising from" clause turns on a " 'but for' causation test: Did the *defendant's* contacts with the Commonwealth constitute 'the first step in a train of events that result[ed] in the personal injury.' " *Lyle Richards,* 132 F.3d. at 114 (emphasis add-

ed) (quoting *Tatro*, 625 N.E.2d at 553). Here, the answer to that question is undoubtedly "no."

Even the most cursory review of the complaint reveals that Q & R took no steps to reach out to Plaintiff in Massachusetts. For example, Plaintiff complains about various Q & R "financial statements" in paragraphs 47 through 56 of his complaint, but those same paragraphs reveal that the statements did not come from Q & R directly, but from Crichton or Drinnon through discovery in one of the earlier lawsuits. Similarly, Plaintiff complains in paragraphs 116 and 117 that on September 24, 2001, Brazie told him during a telephone conversation that a particular account was "frozen," but concedes in those same paragraphs that he, Plaintiff, initiated the communication because he was "alarmed that Crichton might try to trade in [the] account." Likewise, in paragraph 123, Plaintiff complains about "a small pile of [Q & R] documents," but then acknowledges that the documents were sent to him by Vicroy, not Q & R. Finally, in paragraph 240, Plaintiff admits that at the mediation session on January 23, 2003, it was he who "called Quick & Reilly to determine how much [a particular] account was currently worth." (See also *id.* ¶ 118 ("[P]laintiff ... called Quick & Reilly from time to time to check on what [the] account ... was worth.").) Put simply, there is no allegation in the complaint that Q & R, in any way, took the first step in a train of events that resulted in Plaintiff's purported injury.

Granted, Plaintiff attempts to bring in new facts via his brief, to wit, that between 1995 and 1999, Q & R "mailed duplicate copies of all monthly statements and trading slips ... to the Plaintiff at his residence in Massachusetts" and was involved in "literally hundreds of telephone calls with Plaintiff." (Document No. 20 ("Plaintiff's Opposition to Q & R's Motion") at 6–

7.) Again, however, Plaintiff admits that these purported contacts arose, not on Q & R's volition, but because he himself was "actively manag[ing]" the accounts and "personally ... called in" every trade to "Q & R's Cincinnati branch's 800 number ... from his residence in Massachusetts." (*Id.*) At bottom, in this court's estimation, Plaintiff fails to fulfill the "arising from" clause and, thus, fails to demonstrate that personal jurisdiction exists over Q & R under the long-arm statute. He also flunks the due process inquiry since his claims against Q & R do not "arise out of, or relate to, [Q & R]'s forum-state activities." *Workgroup Tech. Corp. v. MGM Grand Hotel, LLC*, 246 F. Supp 2d 102, 112 (D.Mass.2003). Accordingly, the court will recommend that Q & R be dismissed.

### 7. *The Gestalt Factors*

In the court's view, it is unnecessary to analyze the reasonableness prong of the due process inquiry since, as described, the court believes there are numerous other personal jurisdiction hurdles which Plaintiff cannot surmount. Nonetheless, and if for no other reason than to provide a comprehensive report and recommendation, the court will touch briefly on the gestalt factors. *But see Nowak v. Tak How Investments, Ltd.*, 94 F.3d 708, 717 (1st Cir.1996) (indicating that assessment of gestalt factors is particularly important only "where the minimum contacts question is very close").

The court believes that the gestalt factors favor dismissal of all Defendants on personal jurisdiction grounds. As for the first factor, there would be a significant burden on Defendants—none of whom, with the exception of Q & R, has any connection to Massachusetts—were they required to litigate this action here. Plaintiff's argument that Vicroy's office is "near the top floor of the tallest, most presti-

gious" building in Lexington, Kentucky (Plaintiff's Opposition to M & V's Motion at 6), and that B & H "occupies a doubtless extremely expensive suite of offices" (Plaintiff's Opposition to B & H's Motion at 7), misses the point. With regard to the second factor, Massachusetts has little or no interest in adjudicating this dispute: none of the events underlying the case occurred here, none of the parties or witnesses (save Plaintiff) live here, and most, if not all, relevant documents are located out of state. As for the third factor, Plaintiff's purported need to avail himself of this forum is belied by the fact that he has, in recent years, litigated three other lawsuits in Ohio and Kentucky involving substantially the same parties and issues. Regarding the fourth factor, the court cannot conceive that the judicial system as a whole would benefit from forcing this action to be litigated here. Finally, with regard to the fifth factor, this case does not raise "substantive social policies," let alone ones which should be resolved in Massachusetts.

## C. Plaintiff's Motion for Declarative and Injunctive Relief

In an October 3, 2003 pleading entitled "Motion for Declarative and Injunctive Relief" (Document No. 44), Plaintiff asks the court to command certain named judges in Ohio "to immediately refrain from taking any further action" in other lawsuits and declare those lawsuits "to be coram non judice and void." Even assuming, somehow, that such relief could be granted by this court, Plaintiff's motion fails insofar as personal jurisdiction, in this court's estimation, does not exist. Accordingly, the court will recommend that Plaintiff's Motion for Declarative and Injunctive Relief be denied.

## III. CONCLUSION

The court recognizes Plaintiff's perceived loss: not only has his mother died, but he also feels betrayed by people close to him, all against a backdrop of three lawsuits in both Kentucky and Ohio. Nonetheless, the court believes that Plaintiff has not met his burden of demonstrating that this court—in Massachusetts—has jurisdiction over Defendants. In this court's view, it would do Plaintiff no service to allow a matter to survive that is clearly, and ultimately, jurisdictionally barred. Accordingly, and for the reasons stated, the court recommends that Defendants' motions to dismiss be ALLOWED and that Plaintiff's Motion for Declarative and Injunctive Relief be DENIED.[8]

November 3, 2003.

---

**8.** The parties are advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these findings and recommendations must file a written objection with the Clerk of this Court **within ten (10) days** of the party's receipt of this Report and Recommendation. The written objection must specifically identify the portion of the proposed findings or recommendations to which objection is made and the basis for such objection. The parties are further advised that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court order entered pursuant to this Report and Recommendation. *See Keating v. Secretary of Health & Human Services,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378–379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604 (1st Cir.1980). *See also Thomas v. Arn,* 474 U.S. 140, 154–55, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985). A party may respond to another party's objections within ten (10) days after being served with a copy thereof.