**GLENWOOD FARMS INCORPORATED,**
et al., Plaintiffs,

v.

**Garve IVEY, et al., Defendants.**

No. 03–CV–217–P–S.

United States District Court,
D. Maine.

Sept. 8, 2004.

Robert M. Morris, Irwin, Tardy and Morris, P.A., Theodore H. Irwin, Irwin, Tardy and Morris, P.A., Portland, ME, for Glenwood Farms Incorporated, Carrabassett Spring Water Company Incorporated.

Harrison L. Richardson, Richardson, Whitman, Large & Badger, Elizabeth G. Stouder, Richardson, Whitman, Large & Badger, Portland, ME, for Garve Ivey, Thomas B Sobol, Ivey & Ragsdale, Hagens & Berman LLP, Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SINGAL, Chief Judge.

Before the Court are Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and under the *Colorado River* Doctrine (Docket # 7), Defendants' Motion to Increase Page Limit for Brief(Docket # 34) and Plaintiffs' Motion for Entry of Order on the *Colorado River* Doctrine (Docket # 60). The Court held an evidentiary hearing on the merits of Defendants' Motion to Dismiss on April 8, 9 and 16, 2004, following which the parties submitted proposed findings of fact and conclusions of law, followed by simultaneous responses thereto. In addition, prior to the final day of the evidentiary hearing, Plaintiffs filed their Motion for Entry of Order on the *Colorado River* Doctrine.

Defendants' Motion to Increase Page Limit for Brief (Docket # 34) is GRANTED. As explained below, the Court DENIES Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and under the *Colorado River* Doctrine (Docket # 7) and GRANTS Plaintiffs' Motion for Entry of Order on the *Colorado River* Doctrine (Docket # 60).

## I. Introduction

Defendants, two attorneys and their respective law firms, represented Plaintiffs, purveyors of Maine spring water, in settlement negotiations with Nestle Waters North America ("Nestle"), the owner of Poland Spring Water, a major player in the bottled water industry. The negotiations focused on Plaintiffs' allegations that Nestle had engaged in false advertising as to the nature and source of water sold by Poland Spring. Defendants also represented a group of purchasers of Poland Spring water. The settlement discussions between Plaintiffs and Nestle failed, and Plaintiffs allege that the failure was the result of Defendants pursuing claims on behalf of their consumer clients to the Plaintiffs' detriment. Plaintiffs filed suit in Massachusetts state court, which they voluntarily dismissed on August 21, 2003. The action in this Court was initiated the same day.

Defendants responded to Plaintiffs' filing of the present action by seeking dismissal of this case based on lack of personal jurisdiction over the Defendants. Alternatively, Defendants have argued that the Court should abstain under the *Colorado River* doctrine. Having observed the testimony and exhibits presented at the evidentiary hearing, and having carefully reviewed the parties' post-hearing submissions, the Court concludes that it has specific personal jurisdiction over each of the Defendants and that *Colorado River* abstention is not appropriate in this case.

## II. Findings of Fact

■ In makings its finding of fact, the Court employs an intermediate "likelihood" standard to find the necessary facts related to personal jurisdiction. *Foster-Miller, Inc. v. Babcock & Wilcox Canada,* 46 F.3d 138, 146 (1st Cir.1995). By utilizing this standard, the Court "skirt[s] potential preclusionary problems" and "leaves to the time of trial a binding resolution of the factual disputes common to both the jurisdictional issue and the merits of [Plaintiffs' claims]." *Id.* In accordance with this standard, the Court finds that Plaintiffs have established an adequate likelihood that the following facts are true:

*The Parties*

1. Defendant Garve Ivey is a resident of Alabama, admitted to the bar in Alabama, and a partner in the firm Ivey & Ragsdale.

2. Defendant Ivey & Ragsdale is a law firm with its principal office in Jasper, Alabama.

3. Defendant Thomas Sobol is a resident of Massachusetts, and a member of the bar in that state. He is managing partner of the Boston office of the firm Hagens Berman LLP. On at least one occasion, Attorney Sobol has appeared before Maine courts on a *pro hac vice* basis in previous unrelated litigation.

4. Defendant Hagens Berman LLP ("Hagens Berman") is a law firm comprised of twenty-nine attorneys in four offices. The main office is located in Seattle, Washington. Other offices are located in Boston, Massachusetts; Los Angeles, California and Phoenix, Arizona.

5. Plaintiff Glenwood Farms, Inc. ("Glenwood Farms") is a bottler and seller of Maine spring water, with its principal place of business in St. Albans, Maine. The company is owned by Henry Shaw, Jr., a resident of St. Albans, and the Shaw Family Trust.

6. Plaintiff Carrabassett Spring Water Company, Inc. ("Carrabassett") is a Maine corporation with its principal place of business in Gorham, Maine. The company is owned by T. Martin Milligan of Westport, Connecticut and James Milligan of Gorham, Maine. With the exception of T. Martin Milligan, an owner who sometimes works out of his home in Connecticut, all of Carrabassett's facilities and employees are located in Maine.

*The Relationship Between Defendants and Other Co–Counsel*

7. In November 2002, Attorney Jan Schlichtmann approached Attorney Thomas Sobol of Hagens Berman and Attorney Garve Ivey of the firm Ivey & Ragsdale regarding potential litigation against Poland Spring for deceptive and unfair trade practices.

8. Ultimately, Attorney Schlichtmann, Hagens Berman and Ivey & Ragsdale entered into an agreement to "jointly prosecute the Poland Springs litigation, and devote suffi-

cient resources in order to represent zealously and efficiently the plaintiffs and the proposed classes." The agreement further contemplated that "[t]he interest of the plaintiffs and the putative or actual classes in the Poland Springs litigation shall be governed by an executive committee comprised of Schlichtmann, a designee of [Ivey & Ragsdale] and a designee of [Hagens Berman]." (Pls.' Ex. 33.)

9. From the outset, Attorney Schlichtmann, Attorney Sobol and Attorney Ivey (together with their respective firms, "the Attorneys") contemplated that they would undertake representation of two different groups of plaintiffs in litigation against Nestle: (1) suppliers and bottlers of spring water who compete against Poland Spring and (2) consumers who had purchased Poland Spring water.

10. Ultimately, the Attorneys located and signed representation agreements with the following competitors of Poland Spring: Plaintiff Glenwood Farms, Plaintiff Carrabassett, Vermont Pure Holdings, Ltd., and Tear of the Clouds LLC (also known as "Keeper Springs"). The Attorneys also undertook representation of Lori Ehrlich as a representative of the class of consumers of Poland Spring water.

*The Agreement with Glenwood Farms, Inc.*

11. On or about December 11, 2002, Attorney Jan Schlichtmann and Attorney Tom Sobol traveled to St. Albans, Maine to meet with Henry Shaw and his family for purposes of soliciting Glenwood Farms as a client.

12. Following the meeting and after the exchange of some additional information, Joyce Shaw, W. Henry Shaw, Howard Shaw and Jon Shaw, in their respective capacities as owners and officers of Glenwood Farms, signed an Attorney Representation Agreement, dated December 24, 2002.

13. Pursuant to this Agreement, Glenwood Farms retained Hagens Berman, Ivey & Ragsdale and Jan Schlichtmann as their counsel for "all potential and/or actual litigation against the makers and marketers of 'Poland Spring Natural Spring Water.'" (Pls.' Ex. 1.)

14. Following the signing of the Representation Agreement, between January and June of 2003, Henry Shaw had frequent telephone contact with the Attorneys, especially Attorney Schlichtmann, regarding the status of the Poland Spring Litigation.

15. In addition to the Representation Agreement, Glenwood Farms also later signed the Joint Litigation and Confidentiality Agreement, dated April 2, 2003. This Agreement was entered into by and between all of the Attorneys and all of their competitor and consumer clients.

16. In relevant part, the Joint Litigation and Confidentiality Agreement defined "documents, factual material, mental impressions, memoranda, interview reports, litigation strategies and other information, including the confidences of each client" that were received by any party to the agreement from any other party to the agreement as "Common Interest Materials." (Pls.' Ex. 4.)

17. Pursuant to the Joint Litigation and Confidentiality Agreement, Common Interest Materials were

to "be used solely in connection with this Matter" and were to "remain confidential." (Pls.' Ex. 4.)

*The Agreement with Carrabassett Spring Water Company, Inc.*

18. In March 2003, after speaking with Henry Shaw about the potential Poland Spring Litigation, James Milligan spoke with Attorney Jan Schlichtmann about the possibility of Carrabassett joining this litigation as another Maine-based competitor of Poland Spring.

19. Following that initial conversation, James Milligan and T. Martin Milligan (together, "the Milligans") met with Jan Schlichtmann in his Beverly, Massachusetts office. Henry Shaw, along with his wife Joanne Shaw, attended this meeting. In addition, Attorney Garve Ivey participated in at least some portions of the meeting via telephone conference.

20. At the meeting, the Milligans believed that Carrabassett was being solicited as a potential additional competitor plaintiff for the Poland Spring Litigation. In fact, T. Martin Milligan, as President of Carrabassett Spring Water Company, signed an Attorney Representation Agreement dated March 17, 2003. This March 17, 2003 Agreement was also signed by Jan Schlichtmann although neither Hagens Berman LLP nor Ivey & Ragsdale signed this version of the Representation Agreement.

21. The March 17, 2003 Agreement contemplated that the other competitor clients that had already signed agreements with the Attorneys would need to approve the addition of Carrabassett to the po-

tential group of competitor plaintiffs.

22. After the Attorneys apparently received that approval in early May 2003, T. Martin Milligan, as President of Carrabassett, and the Attorneys signed another version of the Attorney Representation Agreement, dated May 23, 2002. This agreement contained a paragraph explicitly stating that the May 23, 2003 Agreement would "supercede[ ] any prior agreement between Carrabassett and counsel." (Pls.' Ex. 7.)

23. Pursuant to the May 23, 2003 Representation Agreement, Carrabassett retained Hagens Berman LLP, Ivey & Ragsdale and Jan Schlichtmann as "its counsel in connection with all potential and/or actual litigation against the makers and marketers of *Poland Spring Natural Spring Water* in connection with certain claims that *Poland Spring* is engaging in false and deceptive advertising under Section 43(a) of the Lanham Act, 15 U.S.C. section 1125(a), and any similar state statutes." (Pls.' Ex. 7.)

24. Via an Addendum to the Joint Litigation and Confidentiality Agreement, dated May 29, 2003, Carrabasset also became a party to the Joint Litigation and Confidentiality Agreement, which included the Common Interest Materials provisions described in paragraphs 16 & 17.

*The "Poland Spring Litigation" Contemplated by the Agreements*

25. After the signing of their respective Representation Agreements, representatives for Glenwood Farms and Carrabassett each un-

dertook various activities in Maine in connection with and furtherance of the potential Poland Spring Litigation.

26. By way of example, James Milligan, on behalf of Carrabassett, entered into various contracts giving Carrabassett rights to various sources of Maine spring water. These contracts were to be part of an overall litigation strategy. Pursuant to this strategy, Carrabassett would offer up these additional sources of Maine spring water to Nestle as part of a larger settlement agreement.

27. For his part, Henry Shaw, on behalf of Glenwood Farms, devoted between forty to fifty hours per week assisting in pre-trial investigation in Maine. This investigation included seeking out witnesses and visiting the Maine Drinking Water Program in Augusta, Maine to obtain documents. Although Mr. Shaw generally received specific instructions regarding the focus of his investigative steps from Attorney Schlichtmann, Shaw believed that the instructions he was receiving came jointly from all of the Attorneys.

28. Shaw, along with Schlichtmann, also participated in the filming of video that included visiting various Maine sites and interviewing Maine witnesses. An edited version of this video was used during the later mediation sessions with Nestle.

29. In order to assist with the analysis of relevant scientific information, the Attorneys hired experts, including two experts located in Maine: Professor Andrew Reeve of the University of Maine, Department of Geological Sciences and Mr. John Peckenham, a research scientist with the Senator George J. Mitchell Center at the University of Maine.

30. In December 2002, Attorney Schlichtmann contacted Professor Reeve in Maine about the possibility of working as an expert in conjunction with the Poland Spring Litigation.

31. Ultimately, Professor Reeve entered into a letter of engagement, dated February 19, 2003. The letter of engagement was signed by Professor Reeve as well as Attorney Sobol. Sobol also signed the letter of engagement on behalf of Attorney Schlichtmann and Attorney Ivey. The letter of engagement specifically stated that Professor Reeve's work would be performed "only upon approval by Thomas M. Sobol of [Hagens Berman]." (Pls.' Ex. 29.)

32. Pursuant to that letter of engagement, Professor Reeve performed approximately one hundred hours of work in Maine. The work entailed review of hydrogeological assessments of Poland Spring properties as well as participation in telephone calls and conference calls. Professor Reeve also traveled to participate in a meeting in Boston and a mediation session held in New Jersey.

33. Professor Reeve's travel expenses were reimbursed by Hagens Berman. In addition, pursuant to the letter of engagement, Hagens Berman paid Professor Reeve at least $6,950.00 in compensation for his work.

34. In the course of this work, Professor Reeve received numerous e-mails and telephone calls in Maine

from Hagens Berman, Attorney Ivey and Attorney Schlichtmann.

35. Mr. Peckenham was first contacted in Maine by Attorney Schlichtmann in January 2003. Attorney Schlichtmann visited with Peckenham in Orono, Maine later that same month.

36. Mr. Peckenham ultimately signed a letter of engagement dated February 19, 2003. As with the letter of engagement signed by Professor Reeve, the Peckenham letter of engagement stated that he was being retained by Attorney Jan Schlichtmann, Hagens Berman LLP and Ivey & Ragsdale. It also specifically stated that Peckenham's work would be performed "only upon approval by Thomas M. Sobol of [Hagens Berman]." (Pls.' Ex. 23.)

37. Pursuant to this letter of engagement, Mr. Peckenham reviewed various technical documents, specifically Poland Spring information obtained from the Maine Drinking Water Program.

38. In the course of conducting his work in Maine, Mr. Peckenham received numerous e-mails from Hagens Berman, Attorney Ivey and Attorney Schlichtmann. Mr. Peckenham also participated in multiple conference calls related to the Poland Spring Litigation.

39. As did Professor Reeve, Mr. Peckenham also traveled to Boston and New Jersey at the request of the Attorneys to discuss the results of his work. His travel expenses were reimbursed by Hagens Berman.

40. In addition, Mr. Peckenham was paid approximately $22,000 in compensation for his work, most of which was completed in Maine. At least a portion of Mr. Peckenham's fee was paid by Hagens Berman.

41. Hagens Berman also attempted to gather information for the Poland Spring Litigation directly by sending a letter to the Maine Department of Human Services invoking its rights under the Maine Freedom of Access Statute, 1 M.R.S.A. § 401 *et seq.*

*The Attempted Mediation*

42. The information compiled via the above described work was ultimately presented to Nestle during a series of mediation sessions that were held outside of Maine. Plaintiffs considered many, if not all, of these compiled materials to be "Common Interest Materials" protected by the Joint Litigation and Confidentiality Agreement that they had signed with the Attorneys.

43. The attempted mediation occurred over seven days of meetings. The first mediation session was held on February 28, 2003 in New Jersey. The second session was also held in New Jersey on April 7, 2003. On May 7 & 8, 2003, the parties held two days of mediation talks in Boston, Massachusetts. An additional two days of mediation was held in Greenwich, Connecticut on May 28 & 29, 2003. A final mediation meeting was held in New Jersey on June 4, 2003.

44. Following the mediation sessions, the Attorneys communicated with Glenwood Farms and Carrabassett via telephone calls, e-mails and letters that were received in Maine. Some of the latter communications from Attorney Sobol sought to dissuade Glenwood Farms and Carra-

bassett from accepting Nestle's settlement offer.

45. Although what happened at the mediation sessions is a matter of considerable dispute, it is fair to characterize the mediation as unsuccessful in that ultimately no settlement was reached with Nestle. Moreover, the failed mediation resulted in a breakdown in the relationship between the Attorneys and the attorney-client relationship between the firms of Hagens Berman and Ivey & Ragsdale and Plaintiffs.

46. Following the breakdown of these relationships and the failed settlement attempt, Hagens Berman and Ivey & Ragsdale proceeded to move forward with various consumer claims against Poland Spring. Their actions included allegedly providing information to the media and setting up a website at www.bottledwaterfraud.com.

47. In addition, on June 18, 2003, Defendants filed various class action complaints against Nestle on behalf of consumers of Poland Spring water.

*The Massachusetts Litigation Filed by Plaintiffs*

48. Believing that Defendants' post-mediation actions had ruined the possibility of a favorable settlement with Nestle, Glenwood Farms and Carrabassett initially filed suit against Defendants in Massachusetts' Suffolk County Superior Court on or about June 23, 2003, seeking injunctive relief and monetary damages stemming from Defendants' representation of Plaintiffs in connection with the Poland Spring Matter. The complaint alleged breach of contract, breach of implied covenant of good faith and fair dealing, misappropriation of confidential information, breach of fiduciary duty, and conversion.

49. Plaintiffs simultaneously filed a motion for a preliminary injunction, seeking an order that would enjoin Defendants from using the Common Interest Materials, require Defendants to remove those materials from the public domain (including the Bottled Water Fraud website and the class action complaints filed in Connecticut, New Jersey and Massachusetts) and prevent the Defendants from serving as counsel in the cases filed in Connecticut, New Jersey and Massachusetts.

50. On June 30, 2003, Plaintiffs' request for a preliminary injunction was denied by the Suffolk County Superior Court. In his decision denying the motion, Justice Van Gestel noted that Plaintiffs' claims presented a bevy of problematic attorney-client privilege issues and characterized the situation as "a sordid mess that demeans all of the lawyers involved." (Defs.' Ex. 94 at 7.) Justice Van Gestel further urged the parties to "sit down ... and attempt to develop a resolution that is in the best interest of the several clients involved." (*Id.*)

51. In furtherance of Justice Van Gestel's suggestion, Defendants held off on filing a complaint or counterclaim, apparently hoping that their inaction would facilitate settlement. (Plaintiffs had expressly agreed to extensions of the time for filing an answer and counterclaim.)

52. Although no settlement was reached (or even apparently seriously discussed), on August 21, 2003, Plaintiffs voluntarily dis-

missed the action filed in the Suffolk County Superior Court.

### The Federal Litigation Before this Court

53. Also on August 21, 2003, Plaintiffs filed the instant action with this Court. The complaint charges Defendants with negligence, breach of contract, breach of the implied covenant of good faith and fair dealing, misappropriation of confidential information, breach of fiduciary duty, conversion, and tortious interference with economic relations. Plaintiffs seek both compensatory and punitive damages.

54. Plaintiffs' claims arise out of the same factual nexus as the claims pressed in the previously filed Massachusetts litigation, namely the allegations that Defendants breached various duties in the course of representing both Glenwood Farms and Carrabassett and that these breaches caused the breakdown of an allegedly advantageous settlement between Nestle and Plaintiffs.

### The Massachusetts Litigation Subsequently Filed by Defendants

55. On or about September 19, 2003, Defendants initiated a new action in Suffolk County Superior Court against W. Henry Shaw, Jr., T. Martin Milligan, James Milligan, Carrabassett Spring Water Company, Inc., Glenwood Farms, Inc., and Jan R. Schlichtmann. That complaint seeks compensatory and punitive damages for defamation, interference with contractual and advantageous relations, breach of contract, breach of implied covenant of good faith and fair dealing, and conspiracy.

## III. Conclusions of Law

1. By December 2002, Attorneys Sobol, Ivey and Schlichtmann apparently had agreed to enter into a joint venture representing various plaintiffs in false advertising claims against Nestle and Poland Spring. As a result, the Attorneys held themselves out to the Plaintiffs and to other members of the public as joint venturers for purposes of the Poland Spring Litigation. On this basis, the Maine contacts of either Attorney Sobol, Attorney Ivey or Attorney Schlichtmann in furtherance of the joint venture may be imputed to the other members of the joint venture for purposes of determining related contacts with the forum. *See Daynard v. Ness Motley, Loadholt, Richardson & Poole, P.A.,* 290 F.3d 42, 55–60 (1st Cir.2002).

2. Defendants' combined contacts with Maine, including those contacts that may be imputed to them, satisfy the requirements for specific personal jurisdiction.

3. There is no basis for the Court to abstain from hearing this matter under the *Colorado River* doctrine.

## IV. Discussion

### A. Personal Jurisdiction

Defendants argue that this Court does not have personal jurisdiction over them based on their claims of less than minimal contact with Maine.

 As the First Circuit had noted on more than once occasion, the determination of personal jurisdiction is "more art than science." *Donatelli v. National Hockey League,* 893 F.2d 459, 468 n. 7 (1st Cir.1990) (quoted in *United States v. Swiss American Bank, Ltd.,* 274 F.3d 610, 617 (1st Cir.2001)). Nonetheless, the First

Circuit has also instructed courts faced with a challenge to personal jurisdiction to look at three general factors:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Sawtelle v. Farrell,* 70 F.3d 1381, 1389 (1st Cir.1995) (citations omitted). Ultimately, it is Plaintiffs' burden to prove that personal jurisdiction exists in a given forum. *Id.* at 1387.

■ While Defendants have posed a number of creative arguments in order to claim that this Court does not have personal jurisdiction over them, the Court finds these arguments unavailing. At the end of the day, Defendants sought out and represented Maine clients. The purpose of the representation was to challenge a competitor's claim that their water was spring water that embodied "what it means to be from Maine." Because of the nature of the claim, Defendants sought out clients who would put a "Maine face" on the case. Defendants also understandably undertook substantial investigation in Maine and hired experts in Maine. Defendants also considered bringing their case against Poland Spring in Maine courts. (*See, e.g.,* Pls.' Ex. 34.) Under the facts presented, Defendants' actions encompass the minimum contacts necessary to satisfy due process. In short, Defendants' contacts with the forum embody "what it means to be *in* Maine" for purposes of specific personal jurisdiction.

Turning to the first of the three factors this Court is instructed to consider, the Court finds that the claims underlying this litigation directly relate to Defendants' activities in Maine. Plaintiffs press both contract claims and tort claims in the pending case. With respect to the contract claims, there is no doubt that Defendants' activities were "instrumental" in the formation of the representation agreements. *Mass. School of Law at Andover, Inc. v. American Bar Ass'n,* 142 F.3d 26, 35 (1st Cir.1998) (quoting *Hahn v. Vermont Law Sch.,* 698 F.2d 48, 51 (1st Cir. 1983)). Specifically, the Court notes that Attorney Sobol traveled to Maine with Attorney Schlichtmann in order to meet with and solicit Glenwood Farms. It was as a result of that meeting that Glenwood Farms signed its Representation Agreement with the Attorneys.

With respect to Plaintiffs' tort claims, the Court is also satisfied that the claimed injuries would not have occurred but for the Defendants' activity in Maine and that Defendants' conduct directed at Maine gave rise to Plaintiffs' tort claims. *See, e.g., Sawtelle,* 70 F.3d at 1389–90 (explaining that "transmission of information" into a state "by way of telephone or mail" constitutes contact with the state for purposes of personal jurisdiction). The Court reaches these conclusions while acknowledging that Defendants' activities outside of Maine also contributed to the allegations that form the basis for Plaintiffs' tort claims. Nonetheless, the Court concludes that the relatedness prong is amply satisfied on the facts presented.

As to the second factor, there is no doubt that in the context of the representation of Glenwood and Carrabassett, Defendants voluntarily and purposefully engaged in numerous contacts with the state of Maine. Defendants also availed themselves of the privilege of conducting busi-

ness in Maine by not only soliciting and representing Maine clients but also by hiring experts in Maine and engaging in extensive investigation and discovery in Maine. Thus, personal jurisdiction in this case is not premised on "the mere existence of an attorney-client relationship." *Sawtelle*, 70 F.3d at 1392. Rather, the case before the Court presents an attorney-client relationship with Maine clients accompanied by sufficient other contacts with Maine that were inextricably tied with the attorney-client relationship and the contemplated litigation against a Maine competitor. In light of these contacts and the context of the representation, it was foreseeable that the Defendants could be haled into court in Maine.

Finally, the Court must consider what has been termed the "gestalt factors." The factors include:

(1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all sovereigns in promoting substantive social policies.

*Id.* at 1394. Even if the first two requirements of relatedness and purposeful availment are met, the Court's additional consideration of the gestalt factors gives the Court an opportunity to consider whether exercise of personal jurisdiction is truly reasonable and would achieve substantial justice.

As to the first consideration, the Court concludes that appearing in Maine poses no special or unusual burden in Defendants—all of the Defendants are attorneys and/or law firms that routinely represent persons outside their home states and engage in nationwide practices. *See, id.* at 1395 ("When . . . a law firm regularly represents clients outside its home state, we

conclude that the burden is neither special or unusual.") Second, the Court finds that Maine has an interest in the attorney-client issues raised by Plaintiffs' allegations since at least one of the Plaintiffs was solicited here in Maine and the effects of Defendants' various alleged breaches affect Maine businesses. In addition, the underlying issue involved the marketing of Maine products by companies doing business in Maine; this gives Maine an additional interest in serving as the forum for adjudication of this case. These same facts lead to the rational conclusion that it would be more convenient for Plaintiffs to litigate their claims in Maine. At the hearing, Plaintiffs representatives in fact testified that they chose this forum because it would be more convenient and less expensive to litigate in this court. Turning to the effective administration of justice, the Court is satisfied that the case could be efficiently litigated in this forum. Certainly, many of the witnesses are located here or in nearby Massachusetts. In short, the Court is satisfied that the exercise of personal jurisdiction over Attorneys Sobol and Ivey as well as their respective law firms in the context of this case does not violate due process or "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)).

### B. *Colorado River* Abstention

■ In addition to their arguments on personal jurisdiction, Defendants argue that this Court should abstain from exercising jurisdiction under the doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) and *Moses H. Cone Mem. Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 103 S.Ct. 927, 74

L.Ed.2d 765 (1983). Under the *Colorado River* doctrine, a federal district court may only abstain from exercising jurisdiction in favor of a parallel state proceeding in "exceptional circumstances." *Colorado River,* 424 U.S. at 813, 96 S.Ct. 1236 (quoting *County of Allegheny v. Frank Mashuda Co.,* 360 U.S. 185, 188–89, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959)). Apart from such circumstances, federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them." *Id.* at 817, 96 S.Ct. 1236. The factors to be considered in determining whether such "exceptional circumstances" exist are:

> (1) whether either court has assumed jurisdiction over a *res;* (2) the inconvenience of the federal forum; (3) the desirability of avoiding piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether state or federal law controls; (6) the adequacy of the state forum to protect the parties' interests; (7) the vexatious or contrived nature of the federal claim; and (8) respect for the principles underlying removal jurisdiction.

*KPS & Assocs., Inc. v. Designs by FMC, Inc.,* 318 F.3d 1, 10 (1st Cir.2003). These factors are to be carefully balanced in each case, "with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone,* 460 U.S. at 16, 103 S.Ct. 927.

■ Plaintiffs argue that there is no parallel state proceeding because the action filed by Defendants in Massachusetts state court has been stayed pending resolution of this lawsuit. While this argument has some merit, *cf. Moses H. Cone,* 460 U.S. at 28, 103 S.Ct. 927 (explaining that "a stay is as much a refusal to exercise federal jurisdiction as a dismissal"), even if there is a parallel state proceeding, the *Colorado River* doctrine does not permit abstention in this case.

Turning then, to the application of the *Colorado River* doctrine factors, the parties agree that there is no *res* for either the state or federal court to assume jurisdiction over. As for the inconvenience of the federal forum, this Court is located in Portland, Maine, approximately one hundred miles north of the Suffolk County Superior Court, located in Boston, Massachusetts. Defendants argue that litigating in Portland is "less convenient to all Defendants and at least one of the Plaintiffs' principals, who lives in Connecticut." Plaintiffs point out that Defendants are represented by "experienced Maine lawyers," that Defendant Sobol is from Danvers, Massachusetts, less than ninety miles away, and that any litigation in New England will be inconvenient to Defendants Ivey and Ivey & Ragsdale. It is clear that litigating in Maine is more convenient for Plaintiffs. All of the Glenwood Farms owners and employees participating in this litigation are residents of Maine, and all but one of the relevant individuals associated with Carrabassett live in Maine. In light of the minimal increased inconvenience to Defendants and the increased convenience to Plaintiffs, this factor weighs in favor of exercising jurisdiction. *Cf. Burns v. Watler,* 931 F.2d 140, 147 (1st Cir.1991) ("We are of the opinion, however, that a two-hour drive does not denote a degree of inconvenience that should significantly influence the question of whether the proceedings in the federal court should be stayed.").

As for avoiding piecemeal litigation, Defendants argue that this Court does not have personal jurisdiction over Jan Schlictmann, a Massachusetts attorney, and T. Martin Milligan, the president (and only employee outside of Maine) of Carrabassett, parties named in the Massachusetts state action filed by Defendants (and who would apparently be named in a potential counterclaim). Plaintiffs respond that Mr. Schlichtmann "specifically represented to the Massachusetts court that he would

submit the Maine Court's jurisdiction for the purposes of this litigation," and that this Court has jurisdiction over Mr. Milligan, "who obviously has substantial business interests and contacts with the State [of Maine]." (Pl.'s Reply to Def.'s Mem. at 6.) Thus, this factor does not suggest that the Court should abstain from exercising jurisdiction.

The next factor for consideration is the order in which the state and federal courts obtained jurisdiction. In weighing this factor, however, "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions." *Moses H. Cone,* 460 U.S. at 21, 103 S.Ct. 927; *see also Elmendorf Grafica, Inc. v. D.S. Am. (East), Inc.,* 48 F.3d 46, 52 (1st Cir.1995). It is clear that the action in this Court was filed before the action filed by Defendants in Massachusetts state court. And because the proceedings in Massachusetts state court have been stayed, there has been no more progress in resolving the substantive issues there than there has been in this Court. This factor does not weigh in favor of abstention.

The claims asserted by both parties in each of their lawsuits are matters of state law. The fact that the resolution in this case centers on issues of state law is not determinative, however: only in "rare circumstances [does] the presence of state-law issues ... weigh in favor of ... surrender." *Moses H. Cone,* 460 U.S. at 26, 103 S.Ct. 927. Defendants contend that Plaintiffs assert novel issues of state law regarding the lawyers' duties to their clients that should be resolved by "those state courts in which the lawyers are licensed to practice law." (Defs.' Proposed Findings of Fact and Conclusions of Law at 17.) However, it is not clear at this point which states' ethics rules, if any, will come into play in this litigation. Defen-

dant Ivey is not licensed to practice law in Massachusetts, and litigating this case in Alabama state court is not an alternative being debated. If Massachusetts rules governing lawyers' behavior do come into play, the questions presented are not so novel as to weigh in favor of abstention. *Cf. Villa Marina Yacht Sales, Inc. v. Hatteras Yachts,* 947 F.2d 529, 534 (1st Cir. 1991) (affirming abstention where viability of a claim for tortious interference with prospective business advantage had not been recognized by Puerto Rico courts and although the claim was "widely recognized and included in the Restatement of Torts;" "Puerto Rico courts do not necessarily follow the 'Anglo American approach' to the law"). If this factor weighs in favor of abstention, it does so only slightly.

As for the sixth and eighth factors, Plaintiffs concede that there is no issue as to the adequacy of the state forum to protect their interests. This factor does not weigh in favor of or against exercising jurisdiction. Defendants do not argue, and the Court does not believe, that it would violate the principles underlying diversity jurisdiction for this court to exercise jurisdiction. This factor does not weigh in favor of abstention.

The seventh factor for consideration is the "vexatious or contrived nature of the federal claim." *KPS & Assocs.,* 318 F.3d at 10. This factor is hotly contested by the parties. Plaintiffs explain that they dismissed the suit in Massachusetts and brought suit in this Court because it would be less expensive (in terms of both travel and attorney's fees) to litigate in Maine, and because they would like to have their case heard in the state in which they do business. Defendants argue that they were "snookered" into not filing an answer in the original Massachusetts action instituted (and subsequently dismissed) by Plaintiffs. They argue that Plaintiffs

should not be allowed to court-hop with impunity after the first court rules against it on a motion for a preliminary injunction. However, Plaintiffs have not come to federal court seeking relief that the Massachusetts court refused to provide: the complaint does not seek injunctive relief, and there has been no motion for a preliminary injunction. Moreover, while Defendants must have been frustrated that their settlement strategy of not filing an answer and counterclaim backfired, there is no indication that the claims made in this Court are contrived, or that Defendants were tricked into this change of forum. The Court concludes that this suit is not vexatious or contrived, and that this factor does not weigh in favor of abstention.

Having considered all of the factors above in light of the directives in favor of exercising jurisdiction, the Court declines to abstain from exercising jurisdiction in this case.

## V. Conclusion

Therefore, to the extent Defendants sought to have this case dismissed pursuant to the *Colorado River* Doctrine, Defendants' motion is DENIED. In addition, for the reasons explained above, the Court DENIES Defendants' Motion to Dismiss on the basis of lack of personal jurisdiction.

To the extent Plaintiffs' Motion for Entry of Order on the *Colorado River* Doctrine seeks to have this Court enter an order denying Defendants' request for abstention, Plaintiffs' Motion is GRANTED.

SO ORDERED.